UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LUKE WEINSTEIN** | : | |
| **Plaintiff** | : | **C.A. NO.: 3:11-cv-01906(WWE)** |
| | : | |
| **VS.** | : | |
| | : | |
| **UNIVERSITY OF CONNECTICUT** | : | |
| **And P. CHRISTOPHER EARLEY** | : | **FEBRUARY 27, 2015** |
| **Defendants** | | |

## AFFIDAVIT OF LUKE WEINSTEIN

1. I was initially appointed on January 17, 2007 for the period of January 29, 2007 through August 22, 2007.  Although a search was required for this position, the search requirement was waived at the request of Department Head Jack Veiga and Executive Director of CCEI, Richard Dino based on an immediate need to fill the position when I was recruited into the position.  Simultaneously with the initial appointment, I also signed a letter of appointment that extended my employment from August 23, 2007 through August 22, 2008.  Thereafter, my appointment was continued on an annual basis in accordance with the terms of the initial appointment: "This position is subject to annual review and may be renewed, subject to availability of funding and your continued satisfactory performance." This promise was also made to me verbally at the time of my agreement to take on the Director position by Management Department Head Jack Veiga and Executive Director of CCEI, Richard Dino where I was told the Director position was permanent subject only to my performance and funding.  Based on the fact that I had other tenure track offers in hand at the time I was offered this position, had this promise not been made, I would not have accepted the position.  See.

Pl. Ex. 53 (John Veiga's "Justification for Hire Without Search" to Interim Dean Mohamed E. Hussein, dated January 5, 2006). At no time during the negotiations to take on this position did I ever agree that I would have to formally reapply for the position each year. Pl. Ex. 23 (appointment letters). In fact, based on the express statements in the letters, I understood and agreed that the terms of my employment were such that I would continue to be reappointed so long as my performance was satisfactory and there was funding for the position.

2. The job duties of the Director of Innovation Accelerator ("IA") are listed in the Job Description, Pl. Ex. 22. These job duties correspond to the work I ordinarily performed on a day to day basis. Although as an administrator of the IA I was responsible to obtain Institutional Review Board ("IRB") approval for the accelerator courses, it was not part of my ordinary job duties to report compliance violations to the Office of Audit, Compliance and Ethics ("OACE"). After raising IRB and Worker's compensation insurance coverage and wage payment concerns within my chain of command in the School of Business (SOB), I was still concerned that there were issues which could harm the university so I reported potential compliance violations to Director of Compliance ("DOC") Rachel Rubin because I was advised by email response from Dean Earley to be silent about the issue and he accused me of putting up road blocks to changes in the SOB affecting the accelerators derived from making the graduate students "fellows". Pl. Ex. 14. I also complained of violation of the state's ethics rules in the evident nepotism, involving Dean Earley and his wife, Elaine Mosakowski who was the Director of SCOPE accelerator, and a professor in the Department

of Management.  In the email, I cited my fear of retaliation to DOC Rachel Rubin on May 25, 2010 and asked that my identity remain confidential in connection with any action taken.  I would not have been asking to keep my identity secret if speaking about these issues to the OACE was part of the work I did every day. In the three years I worked for the university prior to May 25, 2010 I had never had any dealing with the OACE.

3.  I attended a meeting on July 19, 2010 and recorded the comments made by those in attendance on my lap top.  The attached audio CD is a copy of the audio for the full meeting held on July 19, 2010.  The audio recording was subsequently transcribed and I have compared the audio recording with the transcript.  The attached transcript of the audio recording of the July 19, 2010 represents a true and accurate statement of the comments made by the participants in the meeting.  I recognize the voices of all participants in the meeting, as indicated on the transcript, including my own voice, the voice of Dean Earley, Associate Dean Linda Klein, Vice Provost ("VP") Nancy Bull, Executive Director Richard Dino, DOC Rachel Rubin, Department of Management Head John Mathieu, and the alleged Human Resources representative (later claimed to be the University of Connecticut's attorney) Michael Eagen.  The attached transcript also conforms with my memory of what the participants stated at the meeting and I incorporate all of the statements made by me and the others at the meeting as part my affidavit as statements made by me and statements I heard from others at the July 19, 2010 meeting.  Pl. Ex. 80 is an excerpt of the complete audio CD; it represents a partial recording of the conversations, starting at page 35 in the

transcript, that was used in the deposition of Dean Earley. Dean Earley authenticated his voice on Pl. Ex. 80 in his deposition. Earley at 133-136, 139-142, 145, 162.

4. At the July 19, 2010 meeting I advised those in attendance that I was not hired to be an Assistant Professor in Residence ("APIR") but as the Director of IA pursuant to a search. The salary was 20% to 25% higher than an APIR. I was told by John Veiga, the Management Department Head who offered me the position that the position was permanent subject to my satisfactory performance and renewal. Transcript of July 19, 2010 meeting and the audio recording of that meeting (hereinafter both referred to as "Tr.") Tr. at 3.

5. At the July 19, 2010 meeting I advised those in attendance that I was concerned that making an application for the Director of IA position was inconsistent with my written and oral contract and I did not want to waive any rights. This concern was acknowledged by Dean Earley and discussed. Tr. at 8, 24, 26-27.

6. At the July 19, 2010 meeting I advised those in attendance of the documented success of the Innovator Accelerator program as publicly recognized participant companies, University President Michael Hogan, and Connecticut legislators. Tr. at 9 to 24.

7. At the July 19, 2010 meeting I advised those in attendance that I was concerned about "violation of labor laws" based on the changes that were being imposed by the changes to the IA program. Tr. at 25

8. At the July 19, 2010 meeting, Dean Earley sought to clear up the contract issue that I raised regarding applications for a position I had been hired into with the

promise that I would be renewed annually subject to funding and performance. Dean Earley stated he wanted to focus on whether applying for a directorship under the new guidelines would interfere with the contract issues I raised and there followed a discussion of the terms of my appointment, including whether it was an "end dated" position.  That discussion included Michael Eagen, who claimed he was representing Human Resources (but was actually there as an attorney representing the University of Connecticut, as later claimed by the Attorney General's Office in defense of this case), Connecticut Center for Entrepreneurship and Innovation ("CCEI") Executive Director Richard Dino, Management Department Head John Mathieu and Vice Provost Nancy Bull.  Tr. at 26-36.

9.  During the discussion of the terms of my initial contract and renewals Vice Provost Bull claimed that it was Dean Earley's idea to change the way the directors were appointed to head up programs.  This statement is contrary to her later deposition testimony and the deposition testimony of Provost Nicholls in this case.  Tr. at 29.

10. Associate Dean Linda Klein advised those present that the APIR contracts that were sent out in early June 2010 to those who were also directors of accelerators was done as a place holder while the terms of the new process were being sorted out.  Tr. at 36.

11. At the July 19, 2010 meeting, Dean Earley stated he had received very positive feedback with regard to my performance as Director of IA and did not anticipate

making any staffing changes, contrary to the claim made in # 167 of Defendants'
56(a)(1) statement.  Tr. at 37.

12. Dean Earley then referred to my presentation regarding the IA model and said I
would have to decide for myself whether I wanted to continue in the role with the
changes.  Dean Earley said, "The issue is whether or not you want to continue."
Tr. at 37-38.

13. Dean Earley then referred to the process for appointment and that I had not
submitted "the materials," stating it was "problematic from our process
perspective."  He then said, "I'm not saying we won't do it, but it …"  Tr. at 38.

14. After further discussion regarding the process of appointments, and my concerns
regarding the IA program, Dean Earley stated: "You have to decide whether or
not you want – if you were offered this opportunity, this position, given the new
structure, you have to decide whether or not you want to take that obviously."  Tr.
at 39.

15.  After further discussion regarding whether the legislature would approve the
changes to the program, Dean Earley stated, "Well, except for the accelerator re-
design that is embedded within that.  I think you've got to decide, look coming
into this and I had said this to you on the phone, given your performance, I have
no discomfort whatsoever with asking you if you – or inviting you to fill this
position again.  What we had talked about was the wording – and I think I finally
got the wording the right way, is it would be a two year appointment subject to
funding, performance, and embedded within that is the idea that the in residence
contract itself is annually renewable.  And I'm very comfortable with that.  I was

comfortable with that from the outset.  And I tried to convey that to you on the phone.  I do think you've done a very good job with this activity.  Now what you need to decide I think and I think it's only – not only for yourself, but also for the sake of the school is if under the new format that we're proposing you're not comfortable and you don't feel as if it is doing justice to what you would want to do, then I think you need to decide what you want to do with regard to that position.  I'd hate for you to take on a role that you're not committed to, that you don't believe in.  Because I think it won't benefit anyone and everyone will be unhappy with it.  So I would – you know, I appreciate your candor in discussions today, but you need to decide for yourself.  But if you find that you are willing to or are comfortable with that new format that we propose at this school, I'm certainly very comfortable giving [sic] your performance in the past to invite you for this reappointment of the position."  Tr. at 41-42; Earley at 147-154.

16. DOC Rachel Rubin then asked Dean Earley, with regard to my decision to accept the Director of IA position subject to the reduction in student hours, "Is there a deadline on that?  Is there a deadline?"  Tr. at 42; Earley at 154-155.

17. Dean Earley replied to DOC Rachel Rubin:  "No, no, there isn't.  We actually - - we were hoping to make these decisions this week, but in this instance, there's nothing firm.  We were just trying to do in in an expedient fashion so that everyone knows what they're going to be doing."  Tr. at 42; Earley at 155.

18. The conversation then shifted to a discussion regarding the selection process and the qualifications for director positions, followed by additional discussion of whether the Director of IA is an "end date" position, and my view regarding

whether changes to the MBA program voted on by the faculty included the

limitation on student hours, after which Dean Earley then stated, "Anyway, I

appreciate that. But what I would say to you is with regard to you're not feeling

like you've had good input or explanation, you know I just have to be blunt.

We've given you as much as I think we can. I know that a number of people

have discussed these issues and we've had lots of emails, lots of discussion. If

you're not comfortable with it and you still don't feel it's adequate, I'm afraid you'll

just have live with that. Because we have done that. I do think it's really critical

for you to decide how you want to go forward. And I think for the sake of the

program, if you choose not to pursue this, I'd like to know as quickly as possible

so that we can make arrangements otherwise for the sake of the students. So

that when the students come after that end date of your contract as the director

of the IA, if we need to make alternative arrangements, seek out someone else to

take on that responsibility. I want to have as much time as possible to do so. So

I appreciate if you could in a timely fashion let us know how you want to proceed.

*We made an offer – I've made an offer that I'm very comfortable having you*

*continue in that role. If you're not, please let me know.*" Tr. at 52 (emphasis

added); Earley at 164-167.

19. The discussion ended with the participants concurring that all the details

concerning the "fellowship" and the number of hours that students were allowed

to work had still to be clarified. I was directed by Dean Earley to consult with the

Assistant Dean of Graduate Studies, George Plesko for clarification. Tr. at 52-

54.

20. Dean Earley ended the meeting stating, "Please do let me know of your decision of whether or not you want to go forward in your role … directorship as soon as possible." Tr. at 59.

21. At no time during the meeting on July 19, 2010, or at any time thereafter, did Dean Earley, or any person on his behalf, state or indicate that I would still need to submit a current CV and a letter of interest in addition to my communicating acceptance of Dean Earley's offer to take on the Director of IA under the terms and conditions he outlined.

22. Thereafter, on July 21, 2010, I consulted with Associate Dean George Plesko, as instructed by Dean Earley at the July 19, 2010 meeting to confirm that 30 hours per week was the amount a student would be required to participate in the IA and whether the information published on the IA website was acceptable. Pl. Ex. 46 at 3.

23. Between July 23, 2010 and July 28, 2010, I also corresponded by email with Associate Dean Plesko to obtain approval of the offer letter to be sent to the IA students, Pl. Ex. 47. I followed Associate Dean's instructions in both cases.

24. Pl. Ex. 82 is a true copy of the initial version of the draft letter to students dated Jul 23, 2010 followed by the final version of the letter dated July 26, 2010.

25. Dean Earley subsequently referred specifically to this email communication as the reason to deny me continuation in the Director of IA position.

26. Dean Earley's letter of July 28, 2010 stated, "I was informed by my Associate Dean that in several communications subsequent to the July 19th meeting concerning offer letter to the students that you continued to push for conditions in

the offer letters that were inconsistent with the redesigned program model but conformed to the way things had been done in the past." Pl. Ex. 45 at 2.

27. Reviewing Pl. Ex. 47, DOC Rachel Rubin, who did not view these communications at the time since the OACE never conducted an investigation as I requested, testified that these emails did not suggest I was still fighting against Dean Earley's changes, but that I "raised a legitimate compliance concern and we're trying to resolve it. And this email looks like he's still trying to be compliant." Rubin at 334-335.

28. I then informed Richard Dino, the Executive Director of CCEI, that I would accept the position and would do everything in my power to support the program as defined by Dean Earley. Affidavit of Richard Dino at par. 6.

29. Richard Dino informed Dean Earley and Associate Dean Linda Klein on July 23, 2010 that I had accepted Dean Earley's offer. Pl. Ex. 32. Dean Earley admitted receiving the email from Richard Dino. Earley at 195-196. Associate Dean George Plesko was also aware that I was interested in being continued in the position as a result of Richard Dino's email to Dean Earley. Plesko at 84.

30. After I told Richard Dino I would accept Dean Earley's offer, I was not told that I still would have to submit a CV and letter of interest.

31. After the lawsuit was filed, Dean Earley stated the email was not an acceptable way to accept his offer. Earley at 198-199. When asked why he did not communicate his dissatisfaction with the acceptance in writing, particularly in light of Richard Dino's statement, "I assume your office will take the next steps in preparing the associated paperwork, etc.," Dean Earley claimed that he met with

Richard Dino just after the email was sent at 10:30 a.m. on July 23, 2010 and told Richard Dino Earley that I would still need "to apply for the position using that procedures that were in the school," meaning a CV and letter of interest. Earley at 198-200. Richard Dino says if Dean Earley had told him that I still needed to submit a letter of interest and CV he would have passed along that information to me. Affidavit of Richard Dino at pars. 9 & 10.

32. Richard Dino never told me on July 23, 2010 or at any time thereafter that I still had to submit a letter of interest and a CV to apply for a position that had been offered to me on July 19, 2010.

33. Instead I received a letter denying the continuation of my appointment to the position of Director of IA. Pl. Ex. 45 at 2-3. I was the only director in the School of Business that was not reappointed pursuant to the new process. Pl. Ex. 31. I was the only one to express an interest in the Director of IA position.

34. After Paul Gilson and Brian Brady turned down Dean Earley's offer to take the Director of IA job, Richard Dino resigned rather than take on the additional duties of Director of IA or find someone else to do so. Pl. Ex. 85; Affidavit of Richard Dino at par 12-14. Dean Earley then recruited Joe Sweet, a current MBA/JD degree student slated to graduate in December 2010 as the Assistant to the Executive Director of CCEI. Pl. Ex. 31 at 2; Affidavit of Richard Dino at par. 15.

35. Dean Earley did not fill the Director of IA position in 2010/2011 and did not call for nominations for that position in 2011/2012. So the position remained open the entire time I was employed at the university and the year after.

36. After I was informed of Dean Earley's decision not to continue my appointment as Director of IA on July 30, 2010, I informed DOC Rachel Rubin that I believed this was retaliatory action by Dean Earley based on my whistleblowing activity and asked for an investigation by the OACE. I sent her a copy of the termination letter stating the Dean had "stretched to justify his position." Pl. Ex. 45. Current Director of Compliance Kimberly Fearney testified that my request for an investigation under these circumstances should have generated an OACE investigation. Fearney at 97-102.

37. Dean Earley falsely claimed that I did not apply for the Director of IA position as a reason not to continue my appointment. VP Nancy Bull and DOC Rachel Rubin were at the July 19, 2010 meeting during which Dean Earley, on more than one occasion, offered to allow me to continue in the Director of IA position to me if I agreed to support the program based upon the discussion that occurred on July 19, 2010 where I was able to express my concerns regarding my contract claim and with regard to the changes to the IA program. After investigating the open issues regarding hours of student commitment and discussion with my supervisors, I told Richard Dino that I would accept Dean Earley's offer and I told DOC Rachel Rubin I had agreed to support Dean Earley's conditions and provided such assurances. Pl. Ex. 32; Pl. Ex. 45 at p. 1.

38. Nevertheless, Provost Peter Nicholls, VP Bull and DOC all took the position that I did not apply for the position as a legitimate reason to terminate my employment, Nicholls at 108-109; Bull at 109; Rubin at 226, and did so knowing that applying for the position was not an issue in the meeting. In fact, everyone at the meeting

knew I was interested in continuing in the position of Director of IA and Dean Earley stated more than once that I had to decide to accept his offer conditioned upon my agreement to support the redesign of the program. It was reasonable for me to conclude, in the absence of contrary information, that if I am offered the position of Director of IA, this offer assumes that application for the position has been satisfied.

39. Dean Earley also states in the July 28, 2010 letter that his decision was based on "inputs" from the senior dean's staff and that he consulted with the Provost's office. Both VP Bull and Provost Nicholls stated they were not involved in the decision to terminate my appointment. Bull at 11; Nicholls at 21-38.

40. Associate Dean Linda Klein, a member of the selection committee for directors in July 2010, stated that the only decision made by the committee was that I did not apply for the position. She also said the committee made no recommendation for Director of IA. Klein at 206, 207, 219, 242.

41. Dean Earley also claimed that he asked Associate Dean George Plesko whether I should continue as Director of the IA program and he said "No," Earley at 180. Associate Dean George Plesko testified he was never asked to give his opinion on whether I should continue in the position as Director of IA, did not tell Dean Earley "don't appoint [Luke Weinstein] as director or words to that effect" between July 19 and July 28, 2010, and never met with Associate Dean Klein to discuss my appointment to the position because I did not apply. Plesko at 44, 48, 53-54, 97.

42. If I did not apply, then why did Dean Earley write to tell me that I would not be reappointed?

43. Dean Earley's letter terminating my appointment as Director of IA did not mention Richard Dino's email stating I accepted his offer made at the July 19, 2010 meeting. Pl. Ex. 45 at 2-3.

44. DOC Rachel Rubin and VP Bull stated they were not aware of the Richard Dino's email to Dean Earley declaring my acceptance of the offer to continue as Director of IA and my expression of support for the program. Pl. Ex. 32; Rubin at 277-278; Bull at 161.

45. In addition, the July 28, 2010 letter terminating my employment also falsely accused me of continuing to resist the changes to the program based on my communications following the July 19, 2010 meeting that I engaged in at the instruction of Dean Earley. See Pl. Ex. 46 & Pl. Ex 47. These email communications were intended to clarify the terms and conditions of the program going forward as suggested by Dean Early. DOC Rachel Rubin stated my emails were legitimate concerns and not oppositional, that I was being compliant. Rubin at 330-335.

46. Dean Earley admitted that Pl. Ex. 47, my email seeking clarification of the offer letter did not appear to indicate that I was fighting the redesign. Earley at 219-220; Pl. Ex. 82.

47. These emails were the only communications I had with Associate Dean George Plesko concerning student offer letters. Plesko at 104.

48. I did not know at the time that a draft of Dean Earley's termination letter had been sent to DOC Rachel Rubin and VP Nancy Bull for comment before it became final.  Rubin at 322-323.

49. DOC Rachel Rubin did not tell me that she was consulted regarding the termination letter I received, but she did tell me to contact the Commission on Human Rights & Opportunities when I said I thought Dean Earely retaliated against me.

50. DOC Rachel Rubin never told me that I needed to file a "formal complaint" with the OACE in order to commence an investigation. The OACE did not investigate my claim of retaliation contrary to the policies and procedures of that office.  Pl. Ex. 3; Fearney at 106.

51. According to Kimberly Fearney, the Director of Compliance who replaced Rachel Rubin when Rachel Rubin was made the Chief of Staff for President Susan Herbst in June of 2011, Fearney at 12-13, and who testified as the University of Connecticut's Rule 30(b)(6) designee, Fearney at 14-17, the OACE is supposed to take action when it received a complaint of retaliation, including investigation of complaints, Fearney at 17-18; Pl. Ex. 1 at 21.

52. Filing a written complaint is not required to obtain an investigation; upon receipt of a verbal complaint and request for investigation the OACE will either investigate directly or refer the matter to another area, for example if someone claimed they were retaliated against for filing a sexual harassment complaint that matter would be referred to the Office of Diversity and Equity.  Fearney at 26-27, 43.

53. If the matter came to OACE initially for a compliance concern, and retaliation was claimed, the OACE would investigate the retaliation.  Fearney at 28, 47-48. Retaliation under UConn's policy could include a non-reappointment to the position, in which case either the OACE or the Office of Faculty and Staff Labor Relations, where Michael Egan worked, would investigate that complaint. Fearney at 35-37.

54. If an individual claimed retaliation after reporting a compliance issue to OACE and requested an investigation, OACE would likely assign the complaint a case number and follow investigation protocols similar to Pl. Ex. 3; Fearney at 38-41.

55. The OACE would not advise a person with such a complaint of retaliation to go to the Commission on Human Rights & Opportunities.  Fearney at 42-43, 108.

56. If an administrator receives a complaint of retaliation, the UConn policy would require that the administrator either pass on the complaint to OACE or advise the individual to go to OACE or some other appropriate office.  Fearney at 49-51. For example, the OACE opened a file and conducted a retaliation investigation when an employee sent an email to President Herbst complaining of retaliation and the Office of the President forwarded the email to the OACE.  Pl. Ex. 95; Fearney 53-58.

57. In other cases, the complainant contacted the OACE and spoke to Director Fearney directly claiming retaliation and that complaint was investigated. Fearney 64-67, 73-75, 77-79; Pl. Ex. 97; Pl. Ex. 100; Pl. Ex. 102.

58. On the advice of DOC Rachel Rubin, who took no action to investigate possible retaliation, I asked the union to file a grievance.  Rubin at 317-327.

59. At step one of the grievance procedure I raised claims of retaliation.

60. Dean Earley sent Associate Dean Linda Klein to represent him at the step one hearing. She did not realize that it was a grievance hearing until she arrived. Klein at 111-112. Michael Eagen, who represented himself to be from Human Resources when we met on July 19, 2010, and wrote the grievance decision, Klein at 108-109, 114, 147-148, represented the Dean as well.

61. After the hearing, Linda Klein passed off a "transcript" of the meeting which consisted of her typewritten notes to Dean Earley so that he could "run with it," Klein at 119-123, 153; Pl. Ex. 56, and did not conduct any investigation of her own concerning my claim of retaliation.

62. Although Defendants attempt to make it appear that Dean Earley was not involved in making the decision that he did not retaliate against me, Associate Dean Linda Klein testified that she did not make the decision to deny the grievance, nor did she know who did, but Dean Earley nevertheless ordered her to sign the decision "because she was there" which was done after she asked Dean Earley if everything was appropriate or correct. Klein at 113, 147-148.

63. The rationale to deny the claim that I was retaliated against simply quoted the reasons in the July 28, 2010 letter denying me continued appointment as Director of IA. Pl. Ex. 55 at 3-4.

64. At the time this decision was released, Ed Marth, Executive Director of the AAUP, questioned whether there had been a full hearing of my retaliation claim and finding thereon. Pl. Ex. 59. In response, Provost Nicholls sent an email

asking who should make the decision on retaliation. Vice Provost Bull replied, "Rachel?" Pl. Ex. 4.

65. After this exchange, neither Provost Nicholls nor Vice Provost Bull contacted Director of Compliance Rachel Rubin to ask who should make the retaliation decision, Nicholls at 39-42, 56-57, Bull at 29-31, although each stated they assumed OACE was investigating the complaint of retaliation and so they did not report it or make sure an investigation was taking place. Nicholls at 33-34; Bull at 24, 29-31, 45, 72-74.

66. Current Director of Compliance Kimberly Fearney testified that Provost Nicholls or VP Bull should have forwarded the retaliation complaint to OACE. Fearney at 84.

67. Instead, Michael Egan sent emails to Ed Marth stating that the retaliation issue had been resolved in the grievance against me for the reasons set forth in Dean Earley's July 28, 2010 letter, Pl. Ex. 59, and that the AAUP contract does not cover this type of claim. Pl. Ex. 51. Michael Eagen then added "I am not familiar with any statutory right to grieve and/or arbitrate whistleblower complaints." *Id.*

68. Michael Egan was employed in the Office of Faculty and Staff Labor Relations which is one of the two offices specifically mentioned as offices that are responsible for handling whistleblower complaints. Pl. Ex. 2 at 3; Fearney at 33-35.

69. If Michael Eagen was not going to investigate the retaliation complaint on behalf of the Office of Faculty and Staff Labor Relations, he should have referred the complaint to OACE. Fearney at 86-90.

70. I appealed the denial of step one to step two, including the claim that I was retaliated against by the denial of a continued appointment as Director of IA.

71. Provost Nicholls appointed VP Nancy Bull to hear that appeal. Bull at 44.  The appeal was then combined with the grievance of the decision to terminate my APIR employment in May 2011.  Pl. Ex. 52.

72. In July of 2011, I forwarded VP Bull the materials I submitted at step one of the first grievance, a true and accurate copy is attached as Pl. Ex. 60; Bull at 53-59.

73. VP Bull could not verify she understood that the information being sent was to support the whistleblowing claim and did not recall whether any of the information sent factored into her decision which she limited to "what process was followed and why" and not whether retaliation occurred.  Bull at 45-49, 56-59.

74. Although a hearing occurred where the university was once again represented by Michael Eagen, who later wrote the decision, Bull at 79, VP Nancy Bull refused to consider the retaliation claim I made regarding the Director of IA on the merits because she stated the appeal of the step on grievance was untimely.  Pl. Ex. 52 at 2.  In doing so she let stand the decision at step one, made by Dean Earley, stating that I was not retaliated against for the reasons stated in the December 2, 2010 decision.  Pl. Ex. 55.

75. With regard to the claim that I was retaliated against in the termination of my employment as an APIR, VP Nancy Bull also found there were legitimate reasons based on information provided by the School of Business, and even though she testified that she did not consider the retaliation issue, the August 18, 2011 decision addressed that claim directly.  Pl. Ex. 52.

76. The reasons cited in the August 18, 2011 decision for terminating my position as Director of IA and for terminating my employment were false.  No investigation of the validity of the stated reasons was undertake by the OACE, as Rachel Rubin did not investigate in violation of OACE rules, Pl. Ex. 3.  Both decisions, written by Michael Eagen, acting as an undisclosed attorney, were based on information supplied by the Dean Earley or his office.

77. While acknowledging that it would be inappropriate for Dean Earley to make the decision regarding whether he retaliated against me, Nicholls at 44; Bull at 31-33, these administrators, along with DOC Rubin, the university official responsible for the enforcing university policy prohibiting retaliation against whistleblowers, allowed my complaint of retaliation to be decided by Dean Earley and the School of Business and did not assure that my complaint was investigated.

78. Director of Compliance Kimberly Fearney testified VP Bull should have referred the retaliation claim regarding the termination of my appointment as Director of IA to the OACE if she was not going to conduct an independent investigation out of the Provost's office.  Fearney at 91-97.

79. Provost Nicholls and Vice Provost Bull, admitted they were aware that I had complained of retaliation to DOC Rachel Rubin and for that reason did not report my complaint of retaliation as required by University of Connecticut's policies and Code of Conduct, nor did they follow to make sure that an investigation was ongoing. Pl. Ex. 1 at 5; Pl. Ex. 2 at 2-3; Nicholls at 33-34; Bull at 24, 29-31, 45, 72-74.

80. Thus, all the individuals involved in the decision to change the way directors were appointed in the School of Business, a decision made at the same time John Mathieu and I were complaining of potential nepotism involving Dean Earley's wife, Elaine Mosakowski, and I was complaining of potential violation of IRB, Worker's compensation insurance coverage and wage laws, either terminated my employment or refused to take action to investigate my claims of retaliation, thereby supporting the decision to terminate my employment.

81. In May 2011, I was advised that I would not be continuing in my position as an APIR. The decision to terminate my continuing employment with the University of Connecticut's School of Business was made by Dean Earley. In making this decision, Dean Earley violated the procedures of the School of Business as he did not consult with the interim Department Head Mohamed Hussien. Emails produced by the University of Connecticut in discovery establish that there was a need to teach my classes, there was funding for my position, and my performance was satisfactory according to the last evaluation of my performance. Pl. Ex. 62 (John Mathieu's review indicating a merit award is warranted based on performance criteria).

82. The reason given to terminate my employment, as reflected in the grievance decision of VP Nancy Bull, and based on information provided by an unidentified person in the "School of Business" that VP Bull thought might be Associate Dean Linda Klein, Bull 78, was that the courses I "was assigned to teach in 2010-2011 were all electives rather than required ones." Pl. Ex. 52. VP Bull continued, "Management courses are not in as high demand as other disciplines so the

School is refilling Management positions in a very limited way. For this reason, the School is simply reducing electives in the area and adding staffing to key areas of emphasis." Based on this explanation, VP Bull stated there were clear non-retaliatory reasons and that I had not demonstrated any casual connection between my reporting to IRB and OACE in May of 2010 and the decision not to reappoint in May 2011.

83. VP Nancy Bull, who did not write the decision, stated that in order to find a connection between retaliation and adverse action in her grievance decision, "there would have had to have been direct evidence that a whistleblower complaint was directly related to the lack or reappointment." Bull at 67.

84. The claim that I was assigned to teach electives is false. Pl. Ex. 63 is a true and accurate copy of the schedule I was assigned to teach in the fall of 2011 as of June 20, 2011 as listed on the university's website. Pl. Ex. 85A is a true copy of the Management Plan of Study. The Entrepreneurship concentration required 15 credits. Courses MGMT 3230 and MGMT 3243 were offered in the fall of 2011 and I was listed as the professor on the schedule. The courses I was assigned to teach were required courses. As indicated by the true and accurate copy of the Department of Management schedule from the prior year, fall 2010 and spring 2011, Pl. Ex. 65, these were the same courses I was assigned to teach in the 2010/2011 academic year. Two of the fall 2011 sections had 40 students enrolled and another 2011 section had 60 students enrolled. The same enrollment figures appear for the spring of 2012.

85. All of the courses I was scheduled to teach in the fall of 2011 were taught by non-tenure track professors known as adjuncts. Pl. Ex. 66. Indeed, the syllabus I created for "Thinking, Acting and Managing Entrepreneurially" was sent to a potential adjuncts to review and use. Pl. Ex. 67 & 68.

86. Contrary to the claim that the demand for Management faculty was down as a reason to justify the termination of my continuing appointment, on September 1, 2011, Interim Department Head Mohamed Hussein, wrote to Interim Dean of the School of Business Karla Fox to request permission to hire two new tenure track and two new APIR faculty as a "high priority." Pl. Ex. 69. Interim Department Head Hussein made the following points: (1) there was a current lack of qualified faculty to teach necessary courses jeopardizing the Management Program; (2) only 50% of the courses scheduled in 2011-2012 will be taught by current faculty; (3) the shortfall was caused by departure of faculty including me (noting I was assigned to teach 7 courses); (4) of the five positions lost, four were in Strategy/Entrepreneurship (my area of specialization); and the Academic Plan of the School of Business emphasized scholarship in Entrepreneurship (area of scholarship). *Id.*

87. In addition, at the time my continuing employment was being terminated, the School of Business was advertising for an APIR in August of 2011 for the Management Department, at the salary of $100,000, plus $35,370 in fringe benefits, as indicated by the attached recruitment and search application. Pl. Ex. 70; Bull at 106. The minimum qualifications for this position included availability to participate in "Accelerator events in both East Hartford and Stamford," and

"Background with business experiential learning projects." This document noted

that Brian Brady, an APIR who worked in the CCEI when I was Director of IA

(and whose position was slated for elimination in February 2011 along with my

position as indicated in the next paragraphs) was a qualified candidate because

of his work in CCEI "co-mentoring a number of client projects and student

created entrepreneurial ventures." The document also noted funding was

available for this position. I was not offered this open position when it was

claimed that financial priorities in other departments required the elimination of

my position because I taught electives.

88. On April 13, 2011, Dean Earley lied to Professor James Marsden and the entire

faculty and staff in the SOB in an email that was copied to me attached to this

email as Exhibit X. In that email exchange, Professor Marsden inquired why the

CCEI Executive Director position was not included in the call for nominations

sent on April 11, 2011. The call for nominations also did not list the Director of IA

as an available position. Dean Earley replied that the position was not listed

because the current occupant Christopher Levesque "was hired this spring after

a national search as the full-time Executive Director."

89. In fact, as shown by documents produced by the Defendants, entitled University

of Connecticut Recruitment and Search Application, attached hereto as Exhibit

XX, no search took place. As indicated by the comments, the application

replaced a "full search" and the position was filled by an "Audit/Waiver Search

Approved." Under the "Budget Comments" section of the document, with a

request date of 2/25/11, it states that three positions will not be renewed in from

FY12 onwards: "(Brady/Weinstein/Gilson)." Brian Brady and Paul Gilson turned down Dean Earley's request to take over my position as Director of IA. This application was approved by the Provost and VP Bull. Two points are made by this document (1) that the decision to discontinue my employment was made months before it was communicated to me; and (2) both Brady and Gilson had their employment terminated after they refused to take over the Director of IA at Dean Earley's request.

90. Management Department Head John Mathieu was also not reappointed to his position by Dean Earley and claimed retaliation. Affidavit of John Mathieu. Thus, Department Head John Mathieu, who reported nepotism issues to DOC Rachel Rubin, was not reappointed in close proximity to his reports of compliance violations just like I was not continued in my Director of IA position in close proximity to my reports of IRB violations, Worker's compensation coverage, wage issues and nepotism to DOC Rachel Rubin.

91. I have read the above statements and the facts set forth therein are true to the best of my knowledge and belief.

Dated at New London, Connecticut this 27th day of February, 2015.

_____
Luke Weinstein

Subscribed and sworn to before me
This 27th day of February, 2015.

_____
Notary Public

**VALERIE WILLOUGHBY**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES NOV. 30, 2015