STATE OF CONNECTICUT

Hartford, ss

UNIVERSITY OF CONNECTICUT

MEETING HELD ON:

JULY 19, 2010

RE: WEINSTEIN V. UNIVERSITY OF CONNECTICUT

Present:

Dr. Luke Weinstein

Dean Christopher Earley

Dr. Linda Klein

Rachel Rubin, Esq.

Dr. John Mathieu

Dr. Richard Dino

Dr. Nancy Bull

Michael Eagan

Mary Indomenico
Official Court Transcriber

1     DEAN EARLEY:   Thank you for coming to the meeting.  I guess

2     what I'll try to do is turn it over to Luke.

3     DR. WEINSTEIN:  To me.  Okay.  I appreciate everyone coming here

4     this morning.  I know it's - this time of year is hard to get people together.  The

5     reason why I wanted to have this meeting was not to attempt to usurp

6     authorities or anything else like that; I understand that the Dean's Office has

7     control and the Provost's Office has control of making decisions and we get to

8     abide by many of those decisions, some of which we may like, some of which

9     we may not like.

10    But my concern and my confusion comes from either a number of

11    things.  Either my not understanding some of the background or some of the

12    decisions being made and maybe I will get informed on that today and maybe I

13    won't because maybe it's not my place to be informed.  And also some

14    confusion because I'm not certain everyone that's making all of the decisions

15    is fully informed and maybe I'm wrong about that.  Also, but an opportunity to

16    pass information back and forth between the parties so that as decisions are

17    made and as the university moves forward in specific in reference to the CCIIA

18    that it moves forward in the best way that's best for the university, best for the

19    students, best for the clients that we work for, best for the brand of the

20    university, etcetera, etcetera.

1          And I'll put together some notes if you want.  I'll make copies of some

2     of these notes so that you can have copies of these as I'm going through some

3     of these things.

4          But one of the things that's important from a history perspective is

5     since not everyone was involved with this from a history perspective - I think

6     that one's - is there an extra one.  I made enough; I made eight.  Is if you go

7     back to 2006 the CCI looked for three in resident faculty made up of two in

8     residence faculty and one in residents, IA Director.  That went through H.R.

9     Mike, you're in H.R., aren't you?

10          MICHAEL:  Yes.

11          DR. WEINSTEIN:  That went through H.R., they went through

12     national postings, etcetera, etcetera.  And I was actually hired not as an in

13     residence faculty, I was hired through a posting for an IA Directorship.  And

14     one way that one can tell the difference between and in residence faculty and

15     the IA Directorship is my salary was actually 20 - 25% higher than the in

16     residence faculty which - which accounts for the extra responsibilities and

17     workload, etcetera, etcetera of being director.  I was told that this was a

18     permanent position.  I was told that the university could only give me one year

19     contracts because that's all the university could do, but that it was permanent

20     and that I would be renewed subject to funding and subject to performance.  So

21     those were commitments.

1          Those commitments in terms of permanence were oral commitments

2      from people with the authority to make those oral commitments and I have not

3      been back to talk to some of them to make sure they remember it, but because I

4      don't want to raise it to that kind of level, but they were commitments that

5      were made to me.

6          I also turned down at that time several tenure track positions because

7      for those of you who weren't familiar, my background is being a serial

8      entrepreneur for 25 years. After I sold my last business, I'm also a single

9      parent, made a decision that I couldn't start another business cause my

10     daughter was five years old and actually decided to do my PhD and get into

11     academia and did my PhD here at UConn. I was supposed to have actually

12     graduated in 2007, but because of the IA it got delayed for a year because of

13     things that I'll talk about in a moment that took things up. So I turned down

14     several permanent tenure track positions to take that. At the time - before I

15     took it we were having - both before I took the position and after I took the

16     position, there were all kinds of discussions about the five year plans.

17     Currently the plan from the legislation was is that we have to be co-located

18     with C-CAT. We are in East Hartford, but that's a short term plan. The intent

19     was within five years the state was building a technology park at Rentschler

20     Field near the football stadium and that we would all be moving in there.

21     There were all kinds of things like that. So it was a permanent position subject

22     to funding on day six. Governor Rell in her new proposed 2007-2008 budget

1    said we're pulling the $2 million dollars back and forget about the CCIA.  As a

2    former entrepreneur, you know, that's just an obstacle one has to deal with and

3    figure things out.  But it - it had personal impact on me, both from I had a

4    contract and funding was pulled.  It also made an impact on me because it

5    meant that all of the support staff it was also committed to in terms of the

6    CCIA was put on hold.  So I had to run the CCIA, handle by 2-1 faculty load,

7    manage all of the organizational issues without any support, and I was also

8    brought into the team to put together the support for going back to the

9    legislature to try and get the funding renewed which it was done.

10        Also at the CCIA there was a commitment made to IA faculty, we

11   would have three there.  There were also going to be three other faculty that

12   would act as mentors to help out.  Some of the testimony we made to - not we

13   made, for example, Bruce Carlson made to the legislature was it was going to

14   follow the Edge Law model where there are two mentors on every project.  We

15   were going to be doing three projects; we only had three faculty.  By having

16   three other faculty, we would have two faculty for mentors.   In the first two

17   years there was only two faculty that was hired.  We were able to hire in the

18   third year, a third in residence faculty.  That particular person hasn't worked

19   out that well and from an IA perspective and is currently just transitioned or in

20   the process of transitioning to an in residence marketing position.

21        For the first year and a half, we did have the extra faculty mentors

22   which helped with the work load.  After a year and a half, those extra mentors

1    were pulled by the Dean's Office.  I'm not saying that that was the right

2    decision; I'm not saying that was the wrong decision.  I'm just saying that was,

3    you know, that's factual that was the decision.  So essentially from my

4    perspective, we have built a program that I personally am very proud of that,

5    that the university I think is proud of that gets good feedback from other

6    stakeholders in the state that gets -- you heard Chris I think it was on the 2nd of

7    June a number of people completely unsolicited by me stood up at the seminar

8    that was run at the UConn Health Center and talked about  - and if you want to

9    listen to it - the whole session was recorded and it's available on the web.

10   Everything talked about what a fantastic difference their experience at the IA

11   made to their company to raising capital, creating jobs in the State of

12   Connecticut, etcetera, etcetera.  But I think what built that program very much

13   on the backs of Dr. Paul Wilson (phonetic) whose the in residence finance

14   faculty and myself.

15       My typical work week is probably 40 to 50 hours a week working for

16   the Innovation Accelerator.  In addition to that I have a 2-1 load on top of that.

17   It's my decision I'm making about 25% of what I used to make.  But I made

18   this decision because it also gives me the flexibility to be a single parent when

19   I need to be a single parent.

20       I've also done other things such as this last year I initiated, managed,

21   ran, a university-wide student entrepreneurship series focused on getting

22   especially grad students to think about looking at UConn technology and

1   starting -- perhaps taking that technology, licensing it from the university, and

2   starting businesses which is the successful paradigm that exists at places like

3   MIT or Stamford or things like that.   Understanding that this is a long term

4   cultural shift here in the State of Connecticut.  Connecticut is not a - having

5   been an entrepreneur in Connecticut, Connecticut is not a great state for

6   entrepreneurs; it doesn't have the culture of entrepreneurship.  As I say to

7   some of my students in my class, if you're not interested in entrepreneurship,

8   you know, if 15 years from now when you've got a seven year old daughter or

9   seven year old son and you  support them having a lemonade stand and taking

10   that type of path, then I feel like this class is a success as far as you're

11   individually concerned.

12        So I did a lot of things outside what I was asked to do.  I did it on my

13   own initiative because I felt it was the right thing to do for the university, for

14   the students, for the state, for all of the stakeholders.

15        I'm told that one year contracts - and I've had this discussion with

16   Chris - one year contracts are all that we're allowed to have.  And I accepted

17   that when I - when I signed my contract.  I have since found out that other CCI

18   faculty, one of whom started in January of this year, one of whom started a

19   year and a half ago or just over a year and a half ago, start off right out of the

20   box with a three year contract, funded by the exact same funding that funds my

21   position.  So I have an issue with that.  I'm told there's some information the

22   AAUP had a problem with multi-year contracts and I know Ed Marthe

1    (phonetic) isn't here and I specifically - I asked Ed not to come because I

2    didn't want it at that level. The AAUP doesn't have contracts. So I'm told it's

3    the Provost's Office - it's you that has a problem with multi-year contracts -

4    I'm trying to be funny. I apologize if that didn't come across very funny.

5            FEMALE 1: My last name is (inaudible).

6            DR. WEINSTEIN: Touche. That has a problem with multi-year

7    contracts and that's why when Chris has talked to me about the IA

8    Directorship position and the lack of ability to do let's say three year contracts

9    or whatever, that I've raised this - this particular issue. I did sign a new - not a

10   new - a different renewal contract in June of this year for a one year in

11   residence contract to teach - purely to do teaching and not any IA Directorship

12   and I did that to mitigate my exposure or mitigate my damages or however one

13   wants to refer to it. Just as a factual matter since I have a - in my mind - I have

14   a contract with the university that has both written and oral parts to it. I do not

15   believe that I can even apply for the NIA Directorship position without

16   waiving any rights that I have from the oral commitments that were made to

17   me.

18           As a person - you're an attorney so you would know better what that is

19   - and little old pro se over here attempting to play lawyer and things like that.

20   So from my perspective - and now I've been talking all about me - what I

21   would need because there's been so much confusion. I start off six days,

22   everything gets yanked. Every year there seems to be an issue. I had a

1       situation where my understanding is I report to John Matthew (phonetic) and a

2       dotted line report to Rich Dino (phonetic) that neither of them will be in place

3       a year from now and that's disturbing to me. I have no control over that.

4       Those are decisions of other people and that's not the purpose of this meeting,

5       but it's one of the reasons why in order to make me feel comfortable, I need a

6       three year, ten month appointment for consistency and I know Dr. Gilson

7       (phonetic) feels exactly the same way.   I know that I would sign a three year,

8       ten month agreement. I do not know; you'd have to speak with Dr. Gilson as

9       to whether he would sign such a thing.

10          So everything I've talked about so far is about me and I purposely

11       wanted this meeting not to talk about me, but you had to start off somewhere.

12       My bigger concerns are because I don't want to be the captain of a ship that

13       could sink. Has to do with the CCI changes and issues and commitments we

14       made to the legislature, etcetera, etcetera. So I wanted to share some

15       information with people about what we do here at the CCEIA (sic). I believe

16       and I've alluded to this already and you saw that on the 2nd of June Chris that -

17       that we have built a great program at the CCEI (sic). It's a program that

18       bridges and has bridged very successfully, the culture from an academic

19       university environment and a culture of an entrepreneurial business-oriented

20       environment.

21          We have built that great culture I would say in the first two years and I

22       would explain why I'm only talking about the first two years. The money that

1    the IA spent out of total CCI budget was in $2 million dollar range, plus or

2    minus $2 million dollars.  That included the building that we had to in East

3    Hartford.  Maybe it's $2.2 million, maybe it's $1.8 million; I don't have all of

4    those things, but we did that.  And our clients directly using our work product

5    that the teams put together in the model that we're running raised

6    approximately $14 million dollars in private equity.  And from that it helped

7    build - build jobs, helped build companies, etcetera, here in the State of

8    Connecticut which is - I don't know who of you was here in January 2008

9    when we had the open house at the IA.  I think you were there.  I'm sure you

10    were there.  Were you there Nancy?  Were you - Rich was there - Rich was

11    there and I was there too.  You know, the politicians were sort of like falling

12    over each other, crawling over each other's back to claim credit given the

13    recession that was just starting and nobody knew how bad it was actually going

14    to be for having the foresight to fund this center which was both a business

15    school and a law school center.  Both of us can I think, slap ourselves on the

16    back and take a lot of credit.  But the politicians were crawling over each other

17    to take credit for having the foresight to do this and the difference that it was

18    making.  And we saw on the 2nd of June, we saw some of those results when

19    we had to go back to the legislature in - I think it was August 2007 --

20    DEAN EARLEY:  End of '07 --

21    DR. WEINSTEIN:  Was it - I think it was early --

22    DEAN EARLEY:  Last quarter.

1        DR. WEINSTEIN:  Yeah, last quarter of '07 we got testimonials from

2   companies, etcetera, the impact that it's made.  You know, we have had - I still

3   remember one of our first clients came into it with - with skepticism.  He was a

4   Columbia MBA running a - a high tech company involved in the cellular

5   phone environment and he had done a program that he thought was similar to

6   our program at Columbia.  And it was - you know, but he saw free resources

7   coming from the university and thought well, you know, maybe it can work.

8   At the end of the program he said - and these are his words, not mine - is that

9   Columbia provided us this, the UConn program provided us this.  His direction

10  of the business was going like this.    The students started going off like this.

11  And because it was an experiential program, the students are in charge of this.

12  It's the way we run it at the IA; it's actually fairly different than Edge Lab

13  where the mentors tend to direct more of the programs.  We tend to let the

14  students go off.  And when the students started going off in this direction, it

15  was Paul and myself running it -- you know, my experience seems a little bit

16  crazy.  And we didn't pull them back to send them down on this path, we

17  challenged them to support what they were doing.  And they were able to

18  support it, took it off, and we actually totally changed the direction that that

19  business went - still within the cellular business.  And they raised something

20  like $2 million dollars using our work product and Series A funding.

21       You heard Lucy Benai (phonetic) from the talk at that January 2008

22  thing about how she came in with expectations, you know, it was just a bunch

1    of students. She said this was her market. We changed it from this is her

2    market where we said - it's a market, we can maybe make a little bit of money

3    at it, maybe not, there's some interest in there - and found her two other

4    markets. Not "we", the student team because it's the students doing this that

5    completely blew her away and showed not only was there a demand, but there

6    is an excruciating demand. I mean for those of you who have done research,

7    we got 60% response rates from surveys which is an unknown number to an

8    unexpected audience where people were sending in - you know, in the open

9    ended questions at the end of the survey - if you know of anybody that has

10   technology like this, here's my phone number, here's my email address. So

11   again, we completely changed the direction of her business and we completely

12   changed the experience of our students. We had an undergraduate engineer

13   who came through our program who got a job as a consultant with Accenture.

14   And he says 100% of the reason that he got that job at Accenture was because

15   of his IA experience. Because what we do is we challenge those students to

16   look at unstructured problems, to put structure around it, and solve it. The

17   same thing that I - if the four of us started a business, we don't have anyone

18   telling us what to do or where to go; we have to solve the problems on our

19   own. That's the environment that we went in.

20        We - for those of you who didn't read it - I assume everybody did - I

21   just printed off the cover and the first four pages of President Hogan's

22   UConnomy Report to the legislature and to the State of Connecticut from last

1    year. And in fact aside from the first page being the president's letter, the next

2    three pages all talk about the impact of the CCEI of the law IP program and

3    there's my picture on the back page; I do need to lose a little weight. That

4    points out about the difference that we are making to the Connecticut Economy

5    doing what we're doing. And this was part of you know, you all remember

6    what the university went through in terms of discussions at the legislature

7    about what kind of funding, what kind of cutbacks were going to be made at

8    the university. This was all part of the sales pitch by President Hogan to the

9    legislature of what we're doing for the economy. And the reason I believe that

10   he put this CCEI front and center is cause we're doing it. You know, we're not

11   just talking about doing it, we - we had the track record.

12          Given that environment, we have a scenario right now where we're

13   being told that the model has to change as we move forward into next year.

14   Students - we're working the students too hard -- where students have to work

15   fewer hours. The last thing that came out last week and this is something I'm

16   completely puzzled by it because we seem to be dancing around the issue of

17   you know, students are employees and every student that's been through the IA

18   right now is being an employee, they get workers comp. If they're a graduate

19   student, they got benefits which I can fully understand not giving those. But

20   we tell them the hours that they have to be at the IA. We tell them the hours

21   they have to work, we tell them where they have to work, we give them a desk

22   to work at, and we give them a computer to work at.

1    And Mike, I don't know about you, I'm not an attorney, but to me

2    that's my definition of an employee; it's certainly with the IRS will come

3    down and beat you over the head with a 2 x 4 if you try to call them a

4    consultant. And I'm not asking for a response, but we seem to be dancing

5    around this. Where now the latest thing that came out on Wednesday last week

6    is we're going to give students grants and they'll get six credits. And the offer

7    letter to them will say that they have to work the equivalent of what they would

8    work for for six credits and anywhere else which means that - you know, I'm a

9    really good student, I only have to spend six hours for every course, so I can

10   get by 12 hours a week working on this. Rich isn't quite as smart as I am, so

11   he probably has to work 20 hours a week or things like that. I'm just kidding.

12   As opposed to historically what we've said is you get a GA and the GA - you

13   get a GA and that has an expectation of 20 hours a week with it and then you

14   get six credits and that has an expectation of 10 hours for every three credits

15   that you work. So there's another 20 hours. So it's 40 hours a week and we

16   work with reality. You know, there's midterm exams, there' s a big project

17   coming up. Some of the time the students will put in 30 hours; some of the

18   time the students will put in 50 or 60 hours, depending on the time of the

19   semester. But now we're being told that - we can't say that -- they only have

20   to put in six credits worth of work. If they're doing that - I don't understand

21   this, but if that's all they're going to do, why do we give them any money at

22   all? Because I don't give them any money to take an accounting course or a

1     marketing course or a management course.  I as a - for lack of a better term -

2     the captain of the ship, you know, I have to coordinate schedules of students,

3     put faculty teaching of the clients, we have weekly conference calls.  How do

4     you schedule that when students can - can do their own thing?  How do you

5     deliver - I put together some slides here that I just wanted to share with you.

6     Does anybody have problems reading small print?  Cause I printed them out --

7          MALE:  (inaudible).

8          DR. WEINSTEIN:  I printed them out in bigger size too.  There you go.

9     Anybody else?

10         FEMALE 1:  I (inaudible).

11         DR. WEINSTEIN:  Everybody else is good for reading?  If you take a

12     look, the first three slides on the left hand side are an example of - of slides

13     from a final toll gate that was given to a client in the spring where it talks about

14     the research that they did.  This is a team that read three books, 150 white

15     papers, went over 200 websites.  That's the easy part to do.  If we change the

16     model, they can continue to do that.  They also talked to 50 subject matter

17     experts, psychologists, emerging technology specialists, public policy

18     specialists.  We can probably do a whole bunch of that if we change the model

19     to - they did interviews with publishers with digital study tools competitors.

20     They went down to Yale and to UConn and did - to the medical centers and the

21     Yale Med School, they did focus groups, they did in-person interviews with

1    people that have been using some of this technology who'd been using other

2    technology. I don't think we can do that if we change the model.

3         And then the bottom left slide is we send out surveys to approximately

4    100,000 prospective users; the team did this. And this is really experiential

5    learning and we got back approximately 2,000 survey responses which is more

6    normal at 2% response rate and this type of environment. And what we were

7    able to do was inform the client not based on the opinions of the students that

8    are on that team, but inform the clients based on the evidence that was

9    collected. And that evidence - that's the type of evidence collection that we do

10    at the Innovation Accelerator. And it's one of the reasons why if you go back

11    to that $14 million dollar raised - and the reason I only did the first two years,

12    it's not like we did well for the first two years and then it's died since - is that

13    there's a time lag between - during the project and when we collect money

14    based on the evidence. And there's also a time lag based on us collecting this

15    data in terms of surveys from - from our former clients. But the data is so

16    different because angel investors and venture capital firms - and I happen to be

17    a venture capitalist on the side - they are so used to seeing in business plans

18    and request for funding anecdotal information. This is my opinion. This is

19    what we believe the (inaudible) is. This is what a third party report says that

20    everybody in the world's got access to this third party. They're so blown away

21    by the evidence that we collect, it's one of the reasons why they're able to get

22    the funding that they've been able to get. That doesn't mean that we haven't

1   done lousy projects; we have. It doesn't mean - we've had projects where

2   we've said to the team, "I want you to know that the CEO of the client is going

3   to be here on Thursday of next week and his investors have self-invited

4   themselves to that meeting." And at that meeting based on our recommenda -

5   on your recommendations, the CCIA cause it's the brand, those investors are

6   going to make the decision to shut down the business the following Monday,

7   six, eight, ten people will be unemployed or those investors are going to stick

8   their hands in their pocket, pull out their checkbooks, and write more checks to

9   invest. That's - that's not an academic exercise; that's a real world exercise

10  and you can see the sweat pouring off the team. That's not something that

11  they're used to doing and it's not something that we say well, make the

12  numbers look good so people don't get unemployed, it's when you collect

13  data, the evidence says what the evidence says. And it's - and you know, it is

14  what it may.

15       So the top right side is another example that was you know, qualitative

16  research; it was more in a business to business environment. But the bottom

17  right slide is we have looked at what it would take if we want to change the

18  model that we do at the IA because we have to do reduced hours, we can't

19  manage. One of the things that we can do that we've talked about is we can

20  probably save 10% of the time by having the faculty mentors direct the

21  projects. So I'll tell you this that if we do that, it will make my life so much

22  easier. It's very frustrating to bring in teams semester after semester after

1    semester and they do the same stupid mistakes, but they learn from those same

2    stupid mistakes.  So we can direct them.  It's much more efficient use of time.

3    But the value to the students will be substantially less.  And if we're here

4    talking about a university and a value to the students, I think that's wrong.

5            The other thing is we can eliminate what I talked about earlier, the

6    voice of customer surveys.  And I believe we'd save 30% of the time.  So if we

7    made those two changes, we can fit into the new model.  But that's where our

8    real value is.  I've had the pleasure - and my last point here - I've had the

9    pleasure, a friend of mine just retired as director -managing director of the MIT

10   Sloan School Entrepreneurship Lab, Ken Morris.  He's been a friend.  He was

11   a founder of (inaudible) for example and in his later life decided he was going

12   to have a change and he runs the entrepreneurship lab up there where they do

13   similar things to what everybody thinks we do which is they engage with

14   businesses in the field - high tech businesses in the field.  They put together

15   teams of four to five MBA students.  They work 15 to 20 hours a week.  They

16   go off and they engage with those clients and they give them a report and

17   recommendations of what they should do.  And I've had the privilege of twice

18   a year they run a big shin dig at the MIT faculty club where they invite all of

19   their current and former E Lab clients and to say thank you and invite the

20   students and things like that and I've been to six or seven of those now.  And

21   I've purposely - cause I'm looking for ways that we can improve what we do -

22   I purposely you know, over a glass of Chardonnay or a beer, talked with about

1       40 of those clients that have gone through the MIT Sloan School and let me tell

2       you, I would kill to be able to run the CCEIA model with MIT Sloan students.

3       And no disrespect on UConn MBA students, but those MIT Sloan'ers are

4       fabulous. In terms of talking with 40 of those, one has said they got any value

5       out of the program. One. Because what they're getting is they're getting

6       student opinions. I personally - I mentioned before I'm a former serial

7       entrepreneur. My last business we actually engaged with the engineering

8       school at UConn; we funded for about $10,000 each to senior design projects

9       in the engineering school. And I got exactly - they met my expectations

10      perfectly. I had zero expectation of getting anything of value out of - out of

11      engaging with them. And I - they delivered. I got nothing of value. So why

12      did I do it? I did one, for the same reasons that these MIT E Lab clients did it

13      because a bunch of them are MIT grads, they're giving back to the community.

14      But most importantly - and in fact we saw this when we had who was it from

15      Wal-Mart --

16             DEAN EARLEY:  Bill Simon.

17             DR. WEINSTEIN:  Bill Simon was here and we met with him. They

18      actually run similar programs with other schools -

19             MALE:  We've used them as a subject matter.

20             DR. WEINSTEIN:  And we've used them - but they run similar

21      programs with other schools, but he says every one of those other schools run -

22      every one - they run it - sorry, Wal-Mart runs it through their H.R. Department.

1    Because the purpose of this and the reason why I did it was because I got the

2    opportunity to interface with eight engineers, each for a one year period of

3    time, where they had to make reports and I saw what they did and I hired one

4    of them.  So as far as I was concerned, I spent $20,000 to hire a very known

5    entity of someone that could really provide value to my business.  And that's

6    what I paid for hiring any engineer - I paid $20 to $30,000 to hire one.  So I

7    was perfectly happy with that.  Same with these Sloan E Lab clients, that's

8    what they pay for; that's why they're doing this is cause they want to hire some

9    of these students.

10   So you know, we're - we're being told faculty may not specify hours is

11   the new thing.  We have three stakeholders as far as I'm concerned at the - in

12   the projects that we have at the IA.  We have the students, we have the clients,

13   and we have the university.  And what I say because - and this comes up every

14   semester with every team, is there's only one solution to this.  It's either a

15   win/win/win for all of the stakeholders or it's a lose/lose/lose.  And I believe

16   that if we change the model that we're - that we're doing, we're going to end

17   up in a lose/lose/lose scenario.

18   Now am I right?  Am I wrong?  The other thing I wanted to just hand

19   out was we also survey - just started surveying because students that go

20   through classes get - give feedback on things and this is the results from a

21   survey that - the survey that we did in - for the spring semester with comments

22   and about the IA experience and things like that.  And you've got the ratings

1    here. The students are not complaining. I had one I was at a reception run by

2    the engineering school where I had an IA student that had been through the

3    semester - this past semester who said, "I didn't like everything that happened

4    over there, but I'll tell you this, I got more value and experience out of my

5    semester at the IA hands down, than anything else I did with my MBA at

6    UConn." So the students are valuing it. So I don't understand. And it's

7    frustrating to me and it has implications on me personally cause am I the right

8    person even that you would want to run a new and a different program? It's

9    worth taking a model that is being incredibly successful that we look at at the

10   end of every semester and at the end of every year, the faculty over there - the

11   faculty - two of us - and say what can we do differently? How do we change

12   this? How do we improve it? How do we improve the experience? And we

13   look at that and instead what's happening is it's being - in our minds it's being

14   dismantled. It's being dismantled. It's being dismantled by people that

15   haven't been to the IA, that haven't seen it, haven't discussed - and so this -

16   this gets back to maybe the people that are making the decisions don't

17   understand, maybe I don't understand.

18          You know, this gets back to my earlier comment of you know, by my

19   saying whoa, am I trying to usurp the authority of the Dean's Office or the

20   Provost's Office? No, I'm not. The authority lies there. You get to make the

21   decision that you want to make and you get to live with the consequences of

22   those decisions. When I'm a CEO of my business, I got to make the decisions

1    and I got to live with the consequences of them, that's why I get paid the big

2    bucks.  But you should be making those decisions based on the best informed

3    decisions - based on the best information that you have and I don't believe that

4    you have that information.

5            We also have - my last point on here is commitments to the legislature.

6    I asked for Rachel to come here because she actually has a lot of the transcripts

7    of - before the legislature.  Before she pops in, I'll say that you know, I've read

8    most of them too and you know, the transcripts are this long and there's little

9    bits and pieces that if you chose to, you could interpret them one way and you

10   could choose to interpret them another way.  But other than that with these

11   legislatures, one of them Gary LeBeau who's the Senator from East Hartford, I

12   actually have the - I believe I have the pleasure of spending four hours with

13   him on Tuesday next week at a - at an entrepreneurship charity golf

14   tournament and he asks me about these things and I don't know what to say to

15   him.  Because he was one of those people in January of 2008 that was crawling

16   over himself because he was one of the big sponsors behind this and he was the

17   reason why we have to - why we have to be in East Hartford and why we have

18   to co-loc (sic) with C-CAT.  You know, it wouldn't have happened without

19   him.  You know, I know that Rich and Jack Vagan (phonetic) and myself - this

20   was prior to John coming on as department head - used to have these

21   discussions of why can't we just stay at the graduate business learning center?

22   Cause I think you know, we have that facility, we don't have to pay extra rent,

1      we don't have to do lots of things, and it's a really, really nice facility. Why

2      don't we just stay there? Cause that would have been my preference. But

3      politicians have their own agendas too. And we could have stayed there, but

4      then you don't get $2 million dollars. It's a simple decision. You know? It's

5      not difficult. Gary, the only UConn facility he had in East Hartford was

6      Rentschler Field. And that's populated by UConn, what, six times a year or

7      something like that. So whether the - whether the testimony says it or not,

8      we've talked with these people; they've had these expectations. Our clients,

9      Connecticut Innovations talks with these people. We've gotten - we recently

10     got an email from - from Charlie Moret who's a senior person at Connecticut

11     Innovations and I can forward this onto people if they want, talking about how

12     we also mentored two student teams who - UConn technology - where the

13     students had decided to start a company while they were still at school and

14     they were running it even prior to - we brought them into the IA and what we

15     did was instead of bringing in the CEO of a client to come in at a final toll

16     gate, what we did was we arranged for some angel investors and some venture

17     capitalists, including this person from Connecticut Innovations to come in as if

18     they were potential funders. Of these businesses with no commitment on their

19     part and Charlie sent an email that he was just blown away by the

20     professionalism of these students that had - that had been through there. The

21     way they were prepared, the way that they can answer all of the questions, so

22     much so that he invited both of the teams to present to the full Connecticut

1     Innovation investment team with the potential of actually investing and they're

2     starting off by offering to one of the teams they're giving free space to in one

3     of their incubators.

4          So I've done most of my talking.  The most important thing to me

5     cause I've put three and a half years into building this, is the success and the

6     legacy of the CCEI/IA; that's the most important thing to me.  We've got a

7     really successful program that I believe we're in the process of dismantling.

8     It's - it's going to sink.  It's my opinion.  I live with this on a day to day basis.

9     Other people may not share this opinion.  Other people may have some more

10    information.  If they do, I'd love to hear it.

11         And then the second issue is my personal role.  I was hired as Director

12    of the IA for a position that was posted; that is my position.  And now I'm

13    being told that it is being posted for open application by anybody that wants to

14    do it.  And as I said earlier, legally speaking - I don't believe I can apply for it

15    without waiving all of the other commitments and contracts that I have with

16    the university.  So I've done all of the talking and I wanted this to be an

17    interactive session.  But so I've gotten my education side out, maybe I could

18    get some education.

19         DEAN EARLEY:  Let's try to disentangle some of these things.  Cause

20    some of these things for instance for Rachel and Michael are irrelevant or

21    Nancy irrelevant, for some of them they aren't.  And I think it will take a

22    different kind of discussion.  For instance, the educational mission of the IA

1   itself and the hours for instance and the structure, etcetera, really is a matter of

2   the internal to the school.  It's not a matter for the university; it's not a matter

3   for - as long as we're not violating --

4   　　　　DR. WEINSTEIN:  It is and it isn't.  Because I you know, when I saw

5   some of the things that were going on, I think it was a university issue cause it

6   was a - it was a violation of labor laws as far as I was concerned, some of the

7   dancing around some of the issues.  And we've had some - we've had some

8   discussions where --

9   　　　　DEAN EARLEY:  Yeah, Mike I think can address that.  As you know,

10   we've been actually spending a huge amount of time - Lin's been doing this,

11   George has been doing this with H.R. specifically to make sure that any kind

12   of an approach that we take with regard to - I don't even know what we're

13   calling them now anyways - scholarships, fellowships, stipends --

14   　　　　DR. WEINSTEIN:  Grants.

15   　　　　DEAN EARLEY:  All sorts of grants --

16   　　　　DR. WEINSTEIN:  Grants.

17   　　　　DEAN EARLEY:  We've been very careful to vet that so that it's done

18   legally.

19   　　　　DR. WEINSTEIN:  But it's being done in a way that in order to do it

20   legally, we can't run the IA.  You - students get to - I mean I've got the letter

21   here that --

1       DEAN EARLEY:  That's a different issue.  One of issues is our - is the

2   nature of that you know, one thing is the functioning and the way we approach

3   the nature of the IA or any of the other accelerators, cause this encompasses all

4   of the learning accelerators is a matter of pedagogy in how we choose to do so.

5   Compensation issues and whether or not we choose to compensate students is a

6   - - quite frankly, it's a policy matter of the school.  The way we do it has to be

7   qualified and approved by HR so that it's legal, appropriate, etcetera, etcetera.

8   So those - I want to make sure we can disentangle some of these things.

9       DR. WEINSTEIN:  Again, you know, the Dean's Office usurps me.  I

10  assume the Provost's Office usurps the Dean's Office.

11      DEAN EARLEY:  I'm not so sure that usurping is the word.

12      DR. WEINSTEIN:  I'm not certain it's -- it trumps or --

13      DEAN EARLEY:  I think we're hoping to say that financial

14  responsibility for school matters lies with the Dean according to the university

15  bylaws, the Provost.  I report then in fact to the Provost's Office.  The Provost

16  reports to the president and the board of trustees.

17      But with that said, what I'd like to do is let's focus on right now

18  contract issues specific to you because I think that's important to get that

19  cleared up.  And what I can't comment on, maybe Michael can, is whether or

20  not if you chose to pursue this directorship under the new guidelines of how

21  you go out and we have to solicit requests for nomination, self nominations,

22  external nominations, whether or not that would be violating any kind of

1   agreement you've already got on.  Certainly I don't see it violating the written

2   contracts you have; having reviewed that.  Whether or not it would violate oral

3   commitments that have been given to you, that's something that Michael can

4   maybe address.

5        MICHAEL:  Well I don't know what your current appointment terms

6   are.  You - you said you were re-appointed in June for an - you accepted your

7   annual re-appointment?

8        DR. WEINSTEIN:  What I have done is when I was hired -- when I

9   turned down the tenure track positions offers that I had because Rich - Rich

10  Dino and I had had these discussion and he knew that I was close to signing on

11  the dotted line to go somewhere else is I received a six month contract through

12  August - no an eight month contract through August of 2007 and another

13  contract at the exact same time from August '07 to August '08.  In June, July

14  '08 I got one for '08, '09.  In June, July '09, I got one for '09, '10 because

15  that's what I was told that - that it had to be one year contracts which was a

16  mechanism for doing things, but I was also orally told and that was part of my

17  decision for making a decision to take the UConn position over taking a job

18  somewhere else that this was a permanent position subject to the funding from

19  the state because this was an externally funded position and subject to my

20  performance - I think my performance speaks for itself.  I don't know, but

21  anybody has said anything except - no one has communicated anything except

22  wonderful things to me except occasionally when I'm told to butt out and stay

1    out of my things. But I was orally -- I was given an oral contract. And what

2    happened was was in June - I can show you the contract - I got instead of a

3    contract that said I'm continuing on as the Director of the IA with a 2-1 load, I

4    got a written contract that had nothing to do with the IA that was an in

5    residence faculty position with a 4-3 load in the management department.

6         MS. BULL: So Luke, let's think about where we're going to go

7    because the meeting was scheduled for an hour, so we're rapidly coming to the

8    end of the hour. And I think the Dean has articulated quite clearly that there

9    are multiple issues here all together. So we look at the advertisement when the

10   position is advertised. And in this case as I understand it, it was an in

11   residence position. Now there was an end date. I'll use the word "end date".

12        DR. WEINSTEIN: That's fine.

13        MS. BULL: "End dated position". End dated positions are not

14   permanent positions period. It may be ongoing. I know end dated individuals

15   who've been in their job 30 and 35 years, but they are end dated positions.

16   Whether that's a director or a faculty member or a staff person cause we have

17   them across the board. And it is based on source of money.

18        Now this is a AAUP position, so it's governed by the AAUP contract.

19   And the way we are handling end dated AAUP positions - and that does make

20   it different than the law school. Because the law school is not under AAUP.

21   So if they give a three year appointment, that's how they do it. But under the

22   AAUP contract, it's a renewable every year appointment. And we have made

1    those contingent upon satisfactory performance and money.  Frankly, we can't

2    afford not to.  Any business would take that approach as well.

3        So when the Dean approached the Provost --

4        DR. WEINSTEIN:  Any business would not give one year end date

5    contracts because the -

6        MS. BULL:  No, they give at will and tomorrow contracts.  So we're a

7    better deal.  When the Dean approached the Provost about directors - generic

8    directors within the school - we said to him both AAUP and UCPEA have

9    pushed back regarding giving people additional assignments for additional

10   compensation without notifying others that those opportunities were available.

11   Okay.  That's a generic statement.  So if you're going to - if you're going to

12   give someone additional compensation what we ask and we've asked other

13   Deans as well, is announce that --

14       DR. WEINSTEIN:  It was -

15       MS. BULL:  - -as an opportunity.

16       DR. WEINSTEIN:  It was back in 2007.  I got and have been getting

17   additional compensation.

18       MS. BULL:  Generically when the Dean came to us and said he was

19   going to think about directors and reappointing directors or changing

20   assignments for directors, this is a generic topic.  This point is not about you.

21       DR. WEINSTEIN:  Okay.

1          MS. BULL:  It's generic.  We said if you're going to do that, the

2     preference would be that you announce it to the school that these are

3     opportunities.  Now as I remember this conversation, subsequent to that we

4     learned that some directors - may be you, but may be others - had been hired -

5     advertised and hired as directors.  So does that skew the generic announce

6     opportunities?  It might or it might not.  But again, you know, we're setting a

7     framework and the Dean is running the school.  So it's not our job to say you

8     have to do x or y, unless we think it violates the contract or violates something

9     else.

10          So that's just a little bit about how we got here.  Could we do a

11    multiple year appointment?  We would -- we would want that to say that based

12    on funding and based on performance and we would want it to be no longer

13    than three years, but we discourage those types of appointments.  So that's

14    kind of a generic study.

15          So --

16          DR. WEINSTEIN:  I - I appreciate the comments and I understand the

17    difference between generic and specific.  You know?  I hope you appreciate

18    the difference between generic and specific.

19          MS. BULL:  Well I understand --

20'         DR. WEINSTEIN:  In this particular case --

21          MS. BULL:  -- (inaudible) what's happened.

1     DR. WEINSTEIN:  And you know, it's - as I said at the beginning, you

2     know, for lack of better terms, I just work here.  You get to make the decisions

3     how you want to interpret to protect the university and I get to whatever

4     avenues I have open to protect myself given that I have given up things in

5     order to take this, you know?  The most important thing to me whether I'm in

6     this position or not and there's always - there is someone out there, probably

7     many people that are better - would be better for this position than I would be -

8     better than your position, better than anybody.  That's just a reality.  That's

9     what I teach my 14 year old daughter, that there's always someone better.

10     But in the specifics in this particular case, you know, what's important

11     to me is the success of the CCEI/IA.  And from my perspective, I can't even

12     apply for the directorship position.  Because then you know, while I

13     understand the end date contract issue, I was given oral consideration in order

14     to make a decision to come to UConn - to take the position at UConn instead

15     of taking a position elsewhere.

16     MR. EAGAN:  Now I would have to know a lot more about the facts

17     and circumstances.

18     DR. WEINSTEIN:  And I think to put you - -

19     MR. EAGAN:  And it's very unlikely would that be binding on the

20     university.  We have a labor agreement and then an appointment letter, those

21     two documents generally govern the terms and conditions of the appointment.

22     What I - what I am hearing is that you had been appointed as a director.

1       DR. WEINSTEIN:   For a position that was advertised as a director.

2       MR. EAGAN:  In residence qualifying, meaning not permanent - not a

3   tenure track.

4       DR. WEINSTEIN:  It was not a tenure track position.

5       MR. EAGAN:  Is this - Chris is this - are these directorships in addition

6   to an in residence assistant professor and director of x, y, z?

7       DEAN EARLEY:  Yes.

8       MR. EAGAN:  And that's historically how they've always been?

9       MS. BULL:  In this case.

10      MR. EAGAN:  For example, a faculty member --

11      MR. MATHIEU:  They're two (inaudible).   The model we're going to

12   - if I can just weigh in, there's two issues here.  One is just the structure itself

13   and then the second is how this got manifested.  You know, the structure itself

14   is you know, and certainly what Dean Earley's been advocating is that these

15   directors would be an additional responsibility for the faculty could vie for.

16   That was what Nancy articulated.  However, the IA positions were dedicated

17   positions from the get go.  Okay?  They were not faculty -- faculty couldn't

18   apply for the positions that --

19      DR. WEINSTEIN:  Faculty could apply back then --

20      MR. MATHIEU:  Apply for way back when.  You know, they were

21   posted positions, but they were positions that were for the IA which had

22   additional teaching responsibility.  We actually initially we wanted the clinical

1   label, weren't we?  And then told to use the in residence once because that's

2   what's in line with the school.  So you know, the key point here is that they

3   were hired for jobs Luke and Paul and later I think Brian Brady.  And now you

4   know, as of June you were renewed into job B being an in residence faculty.

5   You know, I think Luke is very talented; I think he's well placed as an IA

6   Director, but no offense, but if I was going to recruit for a new residence

7   faculty, I'm not sure that he'd be the perfect person; his skill set is elsewhere.

8   You know, so that's - and that's a bind with respect to the Department.

9         But one other issue here is should we get rid of the dedicated IA

10  positions?  In my mind, I think that's - that's crazy to do that.  I think that's the

11  model we should be going towards.  I articulate this in an email however.  I

12  think that's what we should be doing more of, not less of.  If we have

13  dedicated faculty here, we have some civility, we have longevity, we have all

14  the continuity kinds of issues that I had talked about and we had built in a

15  mechanism by which faculty could participate, it's called a mentoring system.

16  And you know I was advocating is resurrecting that sort of thing, keeping

17  some permanent positions for all the stability and longevity kinds of purposes.

18  All right?  And then having other mechanisms for faculty to participate.  How

19  we deal with Luke given where we are here in July of 2010, that's a related

20  separate issue.  First and foremost structurally - I don't think it can be

21  dismantled.  To my understanding these positions don't exist without

22  additional roles and responsibilities that would be compensated.

1    DEAN EARLEY:   No, that's not true; they still exist.  The issue -

2    really what the issue is - in a sense even from the onset, his position's been

3    hybrid because he's always had teaching responsibilities along with the

4    directorship.

5    MR. MATHIEU:  That's correct.

6    DEAN EARLEY:   All we're talking about now is that whoever

7    occupies that role similarly would be under those constraints.  Let's say it was

8    a tenure track faculty.

9    MR. MATHIEU:  But you guys did that you called it a "role".  Okay?

10   It's "position".  He was - it was a national search for a position.  It's a job on

11   the books.

12   MS. BULL:  Are all IA Directors - for all IA Directors, are they all in

13   residence end dated, number one.  And number two, were they all advertised

14   and hired for those jobs?

15   DR. WEINSTEIN:  Yes.

16   MS. KLEIN:  Just for the IA, for this particular --

17   MS. BULL:  For IA --

18   MS. KLEIN:  - position?

19   MS. BULL:  For all IA's.

20   MS. KLEIN:  You're talking all accelerators now?

21   MS. BULL:  For all accelerators for the director position are they all

22   end dated positions and/or were they all hired to be directors of accelerators?

1    MR. DINO:  Most of them were faculty picking up an expert role, as

2    opposed to positions who actually taught courses.

3    MS. BULL:  Is this the only director of an accelerator that was

4    advertised as such and hired as such as an end date position?

5    MS. KLEIN:  If I can just put some clarity on this contract.  Because

6    this was - this was done in order to - there was a lot of concern by in residence

7    faculties to get the contracts out.  And in fact, you were one of the ones that

8    really was wanting to get that contract as quickly as possible.  And in - with

9    this need to do an announcement and all of that, we were caught in a catch 22

10   and we wanted to get the - a contract out to at least let the in residence faculty

11   know that they have some job security, that they will be hired for this year,

12   give some assurance that way.  And in so - in order to do that because they are

13   all in residence faculty, we just did a generic letter out to them with the

14   statement saying that the load would be adjusted based on other factors.  I can't

15   remember the exact term with the intent that with the accelerators as with other

16   faculty that have taken on additional roles, that that would be clarified as soon

17   as we were able to do it rather than holding up giving you any kind of a

18   contract at all until all this got resolved.  So the intent was never to change the

19   structure.  It was just a mechanism by - to give the faculty some assurance that

20   they had a contract starting in September.  And getting that out the very first

21   part of --

1             DEAN EARLEY:  Back to your point about the position.  We could

2      still treat it as a position.  It doesn't mean that - you know, let's say you took a

3      tenure track  faculty member who wanted that position, we can appoint them to

4      that position.  It doesn't have to be a role because it's just a tenure track person

5      who's taking on those duties as well.  Just like right now with Luke in

6      residence position - I mean in residence person is taking on those duties.

7             MR. MATHIEU:  And that's - that's perhaps just a - (inaudible) he's

8      not (inaudible - noise on recording) future responsibilities.  And maybe that's a

9      semantic difference, but that's (inaudible).  That's the difference between

10      where Luke is coming from and the model that you're articulating may very

11      well work for a lot of places.  You know?  I would submit that this model is

12      actually more effective.  It certainly has the track record of being effective in

13      the IA and I don't understand regardless of what - you know, why would we

14      undermine that structure for a revolving door?

15             DEAN EARLEY:  Well one, it doesn't have to be a revolving door.

16      Number two, for the very fact that we want to have - we never commit a

17      position to an individual and say this is yours permanently.  The only version

18      of that we have of that at the university is obviously is tenure.  Now other than

19      people who receive tenure, we never make that commitment anyway.  When

20      you hire somebody who's a lab assistant over in engineering, they're hired for

21      a contract period.

1          Now the position itself may be permanent.  It could be there's always

2    that (inaudible - noises on recording), but it doesn't mean that the individual

3    (inaudible) position.  That's the issue here with Luke.  Is it doesn't give him or

4    it doesn't give us the requirement that he's the only person (inaudible) and

5    that's why - now by the way -- (simultaneous whispering/talking amongst

6    other participants while he is talking).

7          I think it's something that - something is more relevant.  I think

8    basically from the outset and I told you this when we had a phone conversation

9    about this Luke, the feedback I received has been very positive.  I didn't

10    anticipate any changes in staffing, but we had a process we wanted to send a

11    signal to the entire school.  These are transparent; these are not doled out

12    behind closed doors.  Everyone has the right to look to apply for them, to

13    nominate themselves, and with the philosophy you said which is if it turns out

14    there is somebody who's better for - or better suited, than for the school's sake,

15    for the university's sake, we would choose that individual.  So we want to keep

16    that process open so that we can continue to improve.

17          Now with that said though, what concerns me about your conversation

18    today is given the changes in the nature of how we will operate the accelerator

19    in the future, you have to decide for yourself whether or not you want that role

20    given those changes cause those changes are there.  And this is not something

21    that the Dean's Office decided last week --

1        DR. WEINSTEIN:   Well right now that's not the role I'm in.  Right

2    now I have a renewal letter and I'm an in residence faculty for the fall.

3        DEAN EARLEY:   Well actually the role you're in right now cause

4    (inaudible).

5        DR. WEINSTEIN:   Up to August 22nd.

6        DEAN EARLEY:  Yeah, August 22nd.  So you actually are in that role -

7    in that position right now through that period.  The issue is whether or not you

8    want to continue.

9        Now one of the things that's a bit - complicates this even further is you

10   were nominated and contacted about sending in materials for this position.

11   You chose not to.  And that's problematic from our process perspective

12   because now if we appoint you to this position, well we've done so without

13   having followed the same procedure we used for all of the other directors of

14   the positions.  So it is - what I would say is - I'm not saying we won't do it, but

15   it (inaudible) --

16       DR. WEINSTEIN:   I think the whole process is problematic given that

17   I was hired for a position and now I'm told I have a different position that

18   wasn't what - it wasn't posted through H.R. or anything else like that and then

19   the process by which - where I even do apply, the person that's - the manager

20   of this particular position and the dotted line manager for this particular

21   position, don't even have any input or say on - on the person that's selected.

1      There are no sets of qualifications of what's needed for this position. There's

2      none of what went through H.R. back in 20---

3          DEAN EARLEY: That's not true. We actually sent around specific

4      lists of duties and responsibilities for the director --

5          DR. WEINSTEIN: You sent around duties and responsibilities; you

6      didn't send around anything about qualifications. I don't know how you

7      translate duties and responsibilities into --

8          DEAN EARLEY: Yeah, we did separate (inaudible).

9          DR. WEINSTEIN: You know? And it's - I - you know, I was hired

10     for a position. I do have some real concerns about some very, very real

11     concerns about being captain of a sink - that I think under the new model will

12     sink. I would suspect that if it sinks that - if the legislature will pull the

13     funding anyway.

14         DEAN EARLEY: Well again, it's a separate issue. You have to

15     decide whether or not you want - if you were offered this opportunity, this

16     position, given the new structure, you have to decide whether or not you want

17     to take that obviously. And if you - based on your comments today, it sounds

18     like you're not comfortable with that.

19         DR. WEINSTEIN: I'm not comfortable with the changes that are

20     being made, nor do I think the legislature would be comfortable with the

21     decisions. And the legislature did fund this for - for --

1     DEAN EARLEY:  I don't think you'll find that there are any

2     inconsistencies between the new model that you described that we've put in

3     place and anything that the legislators have in any of the documentation at least

4     I'm seeing and we've gone through it pretty carefully.

5           Now the issue is whether or not in one on one conversations with the

6     legislators and maybe it would be appropriate for us as a school, given that we

7     are talking about subject changes for me and for others to engage those

8     legislators so that they're aware of some of these differences and these changes

9     that can make them aware of issues of funding or concerns about students

10    putting too much time into the accelerators, whether it's consistent with the

11    pedagogical thrust of the MBA re-design.  Because these are the reasons that

12    there was a task force.  You were a member of that task force --

13          DR. WEINSTEIN:  I wasn't a member.

14          DEAN EARLEY:  Yeah, you were - and we had a task force headed up

15    by Jud Saviskas that helped us look into a lot of issues on the accelerators.

16    Now you may not agree with the outcome of that task force, but you were a

17    member of that task force; you attended meetings on that task force.  You

18    provided input.

19          DR. WEINSTEIN:  Not anything to do with an MBA re-design.

20          DEAN EARLEY:  No, no, with regard to the accelerators.  And this AP

21    stuff was re-designed, it was definitely taken by the school.

22          DR. WEINSTEIN:  And no votes were taken, no --

1       DEAN EARLEY:  But there was a vote actually by the entire faculty

2   on the MBA re-design if you recall and it was passed --

3       DR. WEINSTEIN:  I think --

4       DEAN EARLEY: - with two nay votes and everyone else positive and

5   one abstention.

6       DR. WEINSTEIN:  I would -- I would take exception to the

7   characterization of Jud Saviskas' --

8       DEAN EARLEY:  What I want you -

9       MR. MATHIEU:  You guys are talking - -let's talk about the MBA re-

10   design; you were talking about the accelerators.

11       DEAN EARLEY:  Yes.

12       MR. MATHIEU:  You were talking two different things.

13       DEAN EARLEY:  Well, except for the accelerator re-design that is

14   embedded within that.  I think you've got to decide, look coming into this and I

15   had said this to you on the phone, given your performance, I have no

16   discomfort whatsoever with asking you if you - or inviting you to fill this

17   position again.  What we had talked about was the wording - and I think I

18   finally got the wording the right way, is it would be a two year appointment

19   subject to funding, performance, and embedded within that is the idea that the

20   in residence contract itself is annually renewable.  And I'm very comfortable

21   with that.  I was comfortable with that from the outset.  And I tried to convey

1     that to you on the phone.  I do think you've done a very good job with this

2     activity.

3              Now what you need to decide I think and I think it's only - not only for

4     yourself, but also for the sake of the school is if under the new format that

5     we're proposing you're not comfortable and you don't feel as if it is doing

6     justice to what you would want to do, then I think you need to decide what you

7     want to do with regard to that position.  I'd hate for you to take on a role that

8     you're not committed to, that you don't believe in.  Because I think it won't

9     benefit anyone and everyone will be unhappy with it.

10             So I would - you know, I appreciate your candor in discussions today,

11    but you need to decide for yourself.  But if you find that you are willing to or

12    are comfortable with that new format that we propose at this school, I'm

13    certainly very comfortable giving your performance in the past to invite you

14    for this reappointment of the position.

15             MS. RUBIN:  Is there a deadline on that?  Is there a deadline --

16             DEAN EARLEY:  No, no, there isn't.  We actually - we were hoping to

17    make these decisions this week, but in this instance, there's nothing firm.  We

18    were just trying to do it in an expedient fashion so that everyone knows what

19    they're going to be doing.

20             MR. DINO:  Chris, what are the - the committee that's making the

21    recommendation to your two associate deans?

22             DEAN EARLEY:  Yeah.

1          MR. DINO:  What are they using as criteria?

2          DEAN EARLEY:  They've got a list of different characteristics based

3     on the criteria that we sent out about the different roles.

4          MR. DINO:  Is that written down or is that just kind of judgment or?

5     What are you using to determine if somebody's qualified for a position?

6          MS. KLEIN:  Well first we're looking at who's nominated and/or

7     either self-nominated or nominated by others and who expressed an interest in

8     the position --

9          DEAN EARLEY:  They submitted a CV and a letter of interest.

10         MR. DINO:  I mean but how - I understand that.  But how do you

11    determine if somebody's literally qualified to make that work?

12         MS. KLEIN:  You look at their - the past performance and what

13    they've done and what the qualifications are of various applicants just like you

14    would any selection - personnel selection.

15         DR. WEINSTEIN:  But in a personnel selection we file with H.R. with

16    a set of minimum qualifications and preferred qualifications are for that

17    position and then you measure against that and I don't see it here.

18         MR. EAGAN:  And I think it goes to John's point, but if -

19    administrative assignments that are added to a faculty member don't go

20    through that sort of process like your position originally did go through - or

21    what I'm understanding is it was treated as an external search and went

1        through all the protocol for that.  This is internal; it doesn't have the same level

2        of --

3              DR. WEINSTEIN:  But the concept of internal versus external, if you

4        want to have an open process, whether you file the qualifications minimum and

5        preferred qualifications, you do need to still even if it's internal have I would

6        think some type of measure on how you measure applicants.  Otherwise it can

7        be interpreted as a personality contest.

8              MR. MATHIEU:  I think it's safe to say we should certainly have

9        criteria laid out -- we should have this whole processes we're doing so that

10      (inaudible) is it an assignment or role or is it --

11            MR. DINO:  Well, that's what (inaudible).

12           MR. MATHIEU:  Again, that's what we keep coming back to.  And if

13      it's a role, there's a additional set of responsibilities and we defacto eliminated

14      the position that you were hired under.  Yeah, I think that's the issue.  You

15      know?  Unless I missed something, that I think is the issue here.

16           MS. BULL:  And what I'm unable to determine to build on what you

17      just said is how does this position differ from perhaps roles for other

18      accelerators or do we look at all accelerators in the same?  And that's a school

19      decision.  That - and that -- we really do applaud your efforts to make things

20      much more transparent and that's part of what's going on here.  So I think

21      that's - maybe that decision has already been made.  Maybe one accelerator is

22      treated differently from other accelerators because expectations are different or

1    requirements are different.  But that's a - that's a call of the school to make in

2    terms of how they --

3             DR. WEINSTEIN:  Or funding is different.

4             MR. MATHIEU:  Yeah if I can (inaudible) just a second.  There may

5    be lots of reasons.  You know one being yes, to try to make things you know as

6    comparable as possible, you may have apples and oranges, but they're all a

7    fruit at some level.  At another level you say wait a second, you know what GE

8    wants in Edge Lab is going to put a different twist on than one that's with IA

9    or SCOPE or something else, so there's going to be some - some particular

10   kinds of nuances and here mine was dedicated.  And we can go back to your

11   transcripts if you'd like, but the IA was the - the featured piece of it - of the

12   CCEI.  The IA about seeing new companies here and generating jobs and

13   that's what got us the money.  You know, so that's why it was dedicated

14   positions in those.

15            MR. DINO:  Let me motivate the reason I asked the question.  If we're

16   sitting in a room looking at resumes - and God knows you've hired a lot of

17   people, so you've seen all the resumes - I for example spent let's say for

18   example 25 years working with and talking to entrepreneurs and I know

19   exactly the kinds of things that go on with the IA.  I know the kinds of

20   questions they ask.  I know how strong their personalities are and the push

21   back.  And in trying to figure out who might be the right person to be

22   successful in that role, a lot of those criteria and tasks that there may be in my

1    mind are criteria that I would use to assess, well I know that person and I know

2    they'll cave at the first challenge that they're going to get from an entrepreneur

3    or from a student.  That's why I'm asking the question because ultimately

4    whoever you hire for that job, you want to make sure that they have the

5    highest probability that they will succeed and enhance or you know, in general

6    if the goals that we set for the students, for the clients, for the university and

7    that's why I asked the question.

8       MR. MATHIEU:  And to get back on that, certainly I was thinking

9    executive director of the center to have a role in hiring the director.

10       MR. DINO:  Well again, I'm not --

11       MR. MATHIEU:  I don't think - I don't care who's in those positions -

12       MR. DINO:  Trust me, I've got enough to do and I'm not --

13       MR. MATHIEU:  This person is going to be working --

14       MR. DINO:  I'm not asking to be on the committee.  But - but if you've

15    never been at the IA, if you've never participated at a tollgate, if you've never

16    talked to an entrepreneur in a very heated discussion, might those skill sets be

17    important in picking a director?  I don't know.  It's just a rhetorical question; it

18    doesn't have to have an answer.

19       DEAN EARLEY:  It might be, although  you'd expect that there' s a

20    more generic skill set that faculty and academics require with regard to

21    ultimately the pedagogic --

22       MR. DINO:  It could very well be --

1          DEAN EARLEY:   A sense of --

2          MR. DINO:  And trust me, I'm not asking to be on the committee.  I'm

3     just - I'm just effectively (inaudible).

4          (Laughter.)

5          MR. DINO:  I'd rather be in the hall.

6          DEAN EARLEY:  I think the larger issue though is if we do - what I

7     worry about, if we do treat this as a position and we're talking about end date

8     and we're talking about qualifications and advertising, then I'd suggest that

9     with the IA, unlike the others, we need to do a full search every time we go

10    through the renewal process, not just an internal one, but in fact we would

11    actually go out to the market and do an external search which would be very

12    costly and time consuming --

13         MS. KLEIN:  Every year?  Or from three years if we do -

14         DEAN EARLEY:  If we do a two or three year contract then it would

15    be every two or three years.

16         MR. MATHIEU:  Is there anything - Mike, is there anything precluding

17    us from making these permanent jobs subject to funding and  successful

18    performance?

19         MR. EAGAN:  The only faculty jobs that are permanent are tenure -

20    tenure faculty.  And it's clearly a faculty role; it's not a staff - (inaudible) staff

21    role or -- I mean it isn't uncommon as Nancy had pointed out to have in a

22    residence appointment that are renewed indefinitely.

1          MR. MATHIEU:  And those aren't subject to a national search

2     (inaudible) contract.

3          MR. EAGAN:  Upon renewal, not always, no, not typical.

4          MR. MATHIEU:  But that's in res.

5          MS. BULL:  The other side of the coin is - well a couple of sides to this

6     coin.  We've advertised a position as long as we stay within the scope of that

7     advertisement, do you have to go out and re-advertise to reappoint?  Not

8     necessarily.

9          MR. MATHIEU:  That's right.

10          MS. BULL:  If - if you - if you change the scope, let's say we make the

11     director a permanent position, non end date, permanent position funded by the

12     state through CCE/IA, that's okay until the state money dries out.  And then

13     the school has made a commitment because it's not the university, it's the

14     school has made a commitment that they will permanently fund this position

15     until the individual leaves.

16          MALE:  (inaudible).

17          MS. BULL:  Yeah.

18          DR. WEINSTEIN:  No --

19          MS. BULL:  So it depends upon whether the Dean wants to say yes, I

20     just hired a 25 year old and I'm going to make it a permanent.  And if the

21     funding dries out in two years, I'm committed until that person retires.  So

22     there are some --

1          MR. MATHIEU:  This is why I'm not an administrator.

2          MS. BULL:  Well there's some management decisions you know - so

3   the reason we have end dated positions is so you can get out.

4          DR. WEINSTEIN:  But it was very clear from the beginning that the

5   funding of my position was the $2 million dollars that was coming from the

6   state.  And in fact, when it was pulled after six or seven days, in parallel to

7   working - doing my job, I started exploring what my opportunity - what my

8   options were.

9          MS. BULL:  Which is why we call it an "end date" position.  Because

10  if --

11         DR. WEINSTEIN:  We will - we will disagree about oral contracts

12  then.  I think we can agree to disagree.

13         MS. BULL:  I'm sure we will.  I'm sure we will because - because we

14  typically ask to see what's in writing.  And we have a lot of examples of oral

15  contracts.  And I don't know from a legal perspective if they hold up or not,

16  but an end date position by definition says it ends on a certain date.  So --

17         (Cross comments.)

18         MS. RUBIN:  No, no, no.  I think we need to have some follow-up

19  steps cause everybody has --

20         MS. KLEIN:  Cause where do we go from here?

21         MS. RUBIN:  Right.

1      DEAN EARLEY:  I don't know.  I guess first of all we need clarity

2      from the university's perspective of whether or not this is a position or a role?

3      And if it's a position and the occupant has an end date contract in that position,

4      should we seek to renew it?  What procedure do we follow?

5      DR. WEINSTEIN:  And you don't have to answer that right now.

6      MS. RUBIN:  I think Mike --

7      DR. WEINSTEIN:  - not wanting to put you on the spot.

8      MR. EAGAN:  It sounds like there's interest in reappointing Luke in

9      exact - roughly the same role that he was extended in and willingness to do a

10     two year -- but the difference is some of the philosophy of - on the center has

11     changed.  This (inaudible) --

12     MS. RUBIN:  Well the way the students are being placed in the

13     program will change.  And from what I'm getting, Luke has to decide whether

14     or not he can make the program more - based on that --

15     DR. WEINSTEIN:  The students - the students will get disillusioned,

16     the clients will get disillusioned, and the state will get disillusioned.  And I still

17     haven't --

18     (Cross comments.)

19     MS. RUBIN:  But maybe --

20     MR. EAGAN:  That clearly has - has happened and there's been a

21     resolution to the debate that you disfavor, but --

1    DR. WEINSTEIN:  Should I ask Gary LeBeau to come talk to you next

2    week after I see him?

3    DEAN EARLEY:  (inaudible) to discuss it with him and other level of

4    legislatures?

5    MS. BULL:  Yeah.  The discussion of the programmatic educational

6    mission is the Dean's conversation.  And obviously as the leader of the school,

7    the school has made a decision here in some way, shape, or form.  I may not

8    agree with the decision made by the school, whether it's the Dean's decision or

9    the faculty's decision, but it's really the Dean's call to communicate that to the

10    (inaudible).

11    DR. WEINSTEIN:  As I said at the beginning, I have - I recognize - I

12    don't know whose decision it is.  I recognize it's not my decision which is the

13    important thing from my perspective in terms of how the school chooses or

14    chooses not to run a program.  If I want to have that control, maybe I need to

15    apply for a deanship or a provostship or something like that; I fully recognize

16    that.  The concern and the reason I'm raising and it hasn't really been

17    addressed as opposed to saying well, this is the way it's being done as opposed

18    to understanding which is one of the things I would have liked to have

19    understood cause I've raised a number of issues that nobody has said well, I

20    understand you've raised a, b, and c, but here's an answer to a, b, and c.  The

21    only answer I've gotten is well it was voted upon at a - at a faculty meeting the

22    re-design of the program and I voted in favor of the re-design of the program

1      myself.  And what I saw in the re-design of the program was not anything

2      about - there was nothing in there that I remember about the accelerators.

3      There was information in there about changing from having a venture

4      consulting major, a finance major, an accounting major to having - to getting

5      rid of those particular definitions and allowing a student to self select how they

6      do things which is when I got my MBA 28 years ago, that's what I did at

7      Wharton.  I had a self selected technology management major.

8           DEAN EARLEY:  Anyway, I appreciate that.  But what I would say to

9      you is with regard to you're not feeling like you've had good input or

10     explanation, you know I just have to be blunt.  We've given you as much as I

11     think we can.  I know that a number of people have discussed these issues and

12     we've had lots of emails, lots of discussion.  If you're not comfortable with it

13     and you still don't feel it's adequate, I'm afraid you'll just have live with that.

14     Because we have done that.

15           I do think it's really critical for you to decide how you want to go

16     forward.  And I think for the sake of the program, if you choose not to pursue

17     this, I'd like to know as quickly as possible so that we can make arrangements

18     otherwise for the sake of the students.  So that when the students come after

19     that end date of your contract as the director of the IA, if we need to make

20     alternative arrangements, seek out someone else to take on that responsibility.

21     I want to have as much time as possible to do so.  So I appreciate if you could

22     in a timely fashion let us know how you want to proceed.  We made an offer -

1    I've made an offer that I'm very comfortable having you continue in that role.

2    If you're not, please let me know.

3        MS. RUBIN:  Can I just say one thing?  It seems like Luke has made

4    some assumptions too about the students based on the new format, how many

5    hours the students, and who you can use those students and I think it would be

6    helpful to have --

7        MS. BULL:  Well there are greater conversations also going on around

8    the fellowship and the definition --

9        MS. RUBIN:  Right.  And I think that those things need to be flushed

10   out a little bit so --

11       DR. WEINSTEIN:  So I can make an - I can't make an informed

12   decision right now.

13       MS. RUBIN:  He's deciding, he said - well that means some have to

14   work six hours, some have to work twelve hours --

15       DEAN EARLEY:  You know, if --

16       MS. RUBIN:  - that might not be so and I just would like to have more

17   explanation of what it means as far as what he can do directing students and

18   how many hours etcetera, etcetera students will put into it --

19       DEAN EARLEY:  Our Assistant Dean of Graduate --

20       MS. RUBIN:  Cause I think that's important.

21       DEAN EARLEY:  Our Assistant Dean of Graduate Students actually

22   has sent that out to --

1          MS. RUBIN:  Okay.  So have you seen that?

2          DEAN EARLEY:  And the guideline is an average of 30 hours a week.

3          DR. WEINSTEIN:  Except I -- also following that I sent out an email

4     saying can I say the following that you have to be here from these hours to

5     these hours.  And I got back a "yes" that you can do that.  And then Mike

6     Vertefeville's guidelines of this week say specifically faculty may not specify

7     hours.

8          DEAN EARLEY:  If you want to do some follow up on this, you can

9     do so.  But I recommend you talk to George and you can work through the

10    final details.

11         (Cross comments.)

12         DR. WEINSTEIN:  Then I will talk with George and -- you know?  I

13    would like some --

14         MR. MATHIEU:  - confusion regardless if you can (inaudible) versus

15    role  regardless of what George says.  I think that's --

16         (Recording breaks.)

17         MR. DINO:  Within the context of that, what would your - what would

18    your proclivity be if you could say it - if I were to even apply next year?

19         DEAN EARLEY:  I can't say it.  It's not because I don't have opinions

20    one way or the other, but it's not fair to you or to anyone else --

21         MR. DINO:  I understand.

1        DEAN EARLEY:  That's why it has to be (inaudible).   But you know,

2    the issue is - it's like what I told Luke when we first talked about this.  You

3    know, I look at what a person's track record is, how are they performing, how

4    have they done, how do they enjoy what they're doing, you know, all of these

5    kinds of things.  And then you know, it should be one of these that you will

6    decide if you think you're appropriate for it, you will apply.  And that alone is

7    probably a sign that there could be some good chemistry there.  It doesn't

8    preclude other people from being considered and that's the whole idea of this

9    transparency.  Is that we want to give people a chance to - I can't name

10   specifics, but we have for one of the other positions, we had a very - at least I -

11   it was unexpected to me, we had a very unexpected person step up who was

12   interested in one of the other slots.  It had nothing to do with CCEI.  And I

13   think that's great.  It is to me.  It means that there are people now who feel that

14   they can step in; they can try to get access to things that they would like to get

15   access to.  We have to decide whether or not we think that's a good fit for the

16   sake of the school.  But I see it as a really good sign that we get people to step

17   up who wouldn't otherwise.   And that's what I want - I just want more of that

18   at this school.  I want people who've sort of been on the sidelines for whatever

19   reason - they feel that they can step up.  You know, again, not all of them

20   would be appropriate.  And I - one thing I would be very careful about - and

21   please trust that Lin and George and Shanta who were the three actually who

1       on the review committee are making recommendations to me and I sort

2       through as well.

3              But ultimately our - my biggest interest is I want to make sure the

4       school is successful and given all of our (inaudible).  And I know Luke that

5       you may disagree with me fundamentally about how we're reshaping the

6       nature of the accelerator experience, but it's just - again, it's something that

7       you have to decide your comfort level with it, whether or not you want to

8       continue with it, whether or not you don't want to continue with it.  But it's

9       something that I wouldn't be doing if I didn't believe it was for the best

10      interests of our students.

11             And to be blunt, our mission by having read very carefully in all of this

12      testimony and everything else in this document, that first and foremost I know

13      if I talk to Gary LeBeau about this or anyone else, if I say to them, "Should our

14      highest priority be our students?"  They will unequivocally say "yes".  They're

15      not going to say, "No, it should be the Connecticut economy."  They wouldn't

16      have done this activity at the university if they didn't believe in that.

17             DR. WEINSTEIN:  And so students are unhappy?  Because that's not

18      the feedback I get from the students.

19             DEAN EARLEY:  We - we -

20             DR. WEINSTEIN:  If you went and talked - for example, if you - if you

21      went and talked to the students that are at the IA right now --

22             DEAN EARLEY:  If --

1          DR. WEINSTEIN: - asked them and they're doing it in the summer,

2     asked them if they could do this in 25 to 30 hours a week.

3          DEAN EARLEY: The question isn't are they happy. Just like when we

4     - for teaching, we don't - even though we rely on student satisfaction surveys

5     overly, the question is what from a pedagogical view, what learning experience

6     is appropriate and this is a judgment that's going to be made by not me as the

7     Dean, but by MBC, by the faculty, by subcommittees, by the review committee

8     that you were participating in, by a lot of different constituents --

9          DR. WEINSTEIN: But the issue in the review committee that I

10    participated in this issue never came up at all.

11         DEAN EARLEY: The number of student hours?

12         DR. WEINSTEIN: No.

13         DEAN EARLEY: Well it certainly came up in review committees.

14         DR. WEINSTEIN: It never came up, so I was --

15         DEAN EARLEY: You know, I'm sorry that you didn't feel like you

16    had input into this. I believe --

17         DR. WEINSTEIN: I had zero input.

18         DEAN EARLEY: I believe that there were mechanisms. But if you

19    didn't, I'm sorry that that's the case.

20         DR. WEINSTEIN: To the best of my knowledge, well not to the best

21    of my knowledge. I can factually state that no one on any of those committees

22    ever approached students or faculty at the IA to get input.

1    DEAN EARLEY:  Maybe not, but I can tell you this.  There are a lot of

2    people who have carefully considered this in the school and had trust in their

3    colleagues to believe that it's (inaudible) --

4    DR. WEINSTEIN:  I have trust in colleagues who - who get - make

5    informed decisions.  I have no problem with - with different decisions that are

6    informed decisions.  I have --

7    DEAN EARLEY:  Luke, fundamentally you --

8    DR. WEINSTEIN:  I have serious problems with --

9    DEAN EARLEY:  I'd prefer you not to insult your colleagues by

10   saying they make uninformed decisions --

11   DR. WEINSTEIN:  I'm saying that they didn't collect the information.

12   DEAN EARLEY:  The decisions that they made you're going to have

13   to live with.  This is the part of the collegial environment that you're in.  If you

14   don't feel as if the IA was represented, trust me, other accelerators, other

15   students, MBA students were involved and to give feedback.  If you're not

16   comfortable with that, I understand that.  But I'm not going to stand - or sit

17   here and listen to you say that your colleagues who have put a lot of time and

18   energy into this, have been making uninformed or ill informed decisions.  It's

19   insulting to them.  And I know for a fact how much time they put into this

20   review process.

21   DR. WEINSTEIN:  Then it's insulting to me that nobody came to the

22   IA and spoke to - to faculty or students or --

1          DEAN EARLEY:  I'm sorry you're not comfortable with that.

2          DR. WEINSTEIN:  Okay.

3          DEAN EARLEY:  Please do let me know of your decision of whether

4     or not you want to go forward in your role --

5          DR. WEINSTEIN:  I will speak to --

6          DEAN EARLEY: -- in directorship as soon as possible.

7          DR. WEINSTEIN:  I will speak to --

8          DEAN EARLEY:  Thank you.

9          DR. WEINSTEIN:  I will speak to George Plesko.

10          (End of meeting.)

11

12

13

14

15

16

17

18

60

1                          C E R T I F I C A T E

2

3          I, Mary Indomenico do hereby certify that the forgoing transcript of the

4    meeting held on July 19, 2013 at the University of Connecticut, is a true and

5    accurate transcription of the recording presented to me to the best of my

6    knowledge and ability.

7          IN WITNESS THEREOF, I have hereunto set my hand this 12th day of

8    September, 2013.

9

10   _Mary C Indomenico_          _9-12-13_

11   Mary Indomenico, Transcriber                    Date

12

13

14

15

16

17

18

19

20

21

22