UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUKE WEINSTEIN, | : | 3:11cv1906 (WWE) |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | |
| and P. CHRISTOPHER EARLEY, | : | |
|     Defendants. | : | |

**MEMORANDUM OF DECISION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

In this action, plaintiff Luke Weinstein, a former University of Connecticut professor and Director of the Innovation Accelerator at the University of Connecticut ("UConn"), alleges that defendants UConn and Dean P. Christopher Earley are liable for violation of his First Amendment right to free speech and violation of Connecticut General Statutes § 31-51q and § 31-51m.[1]  Plaintiff also alleges a state common law tort claim of intentional interference with advantageous business relationship against defendant Earley.

Defendants filed a motion for summary judgment, which this Court granted in part and denied in part.  Specifically, the Court granted summary judgment on plaintiff's claims of First Amendment retaliation based on his speech relevant to workers' compensation coverage for students, payment for students, and Institutional Review Board approval, and denied without prejudice summary judgment on all state law claims pending the Connecticut Supreme Court's consideration of the proper standards

---

[1]The section 1983 First Amendment claim is construed to be against only defendant Earley in his personal capacity.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71 (1989) (section 1983 does not provide a cause of action against the state or its officials in their official capacities).

1

applicable to section 31-51q.[2]  See Trusz v. UBS Realty Investors, LLC, 319 Conn. 179 (2015)

Although his complaint failed to allege that he had been retaliated against based on his speech concerning Dean Earley's nepotism, plaintiff had so argued in his opposition brief and submitted evidentiary support of such claim. The Court ruled that it would consider the merits of plaintiff's claim and afforded defendants the opportunity to file a supplemental motion for summary judgment.[3]

Defendants have now filed a supplemental memorandum for summary judgment on plaintiff's claim of retaliation based on his speech related to nepotism and the Connecticut Supreme Court has issued its ruling in Trusz v. UBS Realty.  Accordingly, the Court will consider whether summary judgment is appropriate on the remaining

---

[2] In a footnote, plaintiff requests the Court to reconsider a portion of its ruling granting summary judgment on the First Amendment retaliation claim.  The Court had reasoned that plaintiff's speech lacked a civilian analogue because his speech owed its existence to his position at UConn. Plaintiff asserts that his Internal Review Board complaint regarding the Special Olympics was not part his job duties and should have been considered protected speech.  However, plaintiff could have but failed to file a timely motion for reconsideration on this issue.  Further, plaintiff has not argued that his speech to the Internal Review Board concerning the Special Olympics had a civilian analogue.  The Court will adhere to its decision granting summary judgment to defendants.

[3] A district court may consider claims outside of those raised in the pleadings when doing so does not cause prejudice.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 2000).  Claims that are based on new facts and legal theories without relation to previously pleaded claims are generally considered prejudicial to a defendant, who may not have had notice and opportunity to conduct discovery.  Lynn v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir. 2010); Armstrong v. Metropolitan Transp. Authority, 2015 WL 992737, *11 (S.D.N.Y. 2015).  Plaintiff had alleged that he was retaliated against after he spoke out against unethical and potentially illegal conduct, which may be construed to encompass his speech relevant to nepotism. Defendants had notice of such allegations and had an opportunity for discovery on such allegations.

federal retaliation claim and the state law claims.  For the following reasons, the Court will grant the motion for summary judgment on the First Amendment retaliation claim against Dean Earley and decline supplemental jurisdiction on the state law claims.

## BACKGROUND

The parties have submitted statements of fact with supporting exhibits attached.  The statements of fact, exhibits and pleadings reveal the following factual background.

Plaintiff was employed at UConn from January 2007 until August 22, 2011.  Until August 22, 2010, he was employed as the Director of the Innovation Accelerator, an experiential learning center, and as an Assistant Professor in Residence in the Management Department of the School of Business Management.  From August 23, 2010, through August 22, 2011, plaintiff was employed as an Assistant Professor in Residence.  These positions were not eligible for academic tenure.

The job description for Director of the Innovation Accelerator provided that the Director reported to the Head of the Management Department and "will be appointed on an eleven-month renewable appointment as an In-residence Assistant Professor of Management."  As set forth in the description, the Director was expected to, inter alia, "establish a triage process to determine quickly what the needs are and whether work through the Innovation Accelerator will respond to the business need;" "create linkages with the technology schools at the University;" and "develop the right team of students and faculty from various disciplines to work with the business on a timeline."

Plaintiff was the first Director of the Innovation Accelerator. Plaintiff's initial appointment letter and appointment letters for 2008-2009 and 2009-2010 stated: "This position is subject to annual review and may be renewed, subject to the availability of

funding and your continued satisfactory performance."

The appointment letter for the 2010-2011 position of Assistant Professor in Residence provided: "This position does not lead to permanent academic tenure but it may be renewed annually depending upon performance, funding and relevance to the academic mission."

The work load for students participating in the Innovation Accelerator was considered to be very demanding.

In March 2010, plaintiff sent an email to Michael Deotte, whom plaintiff understood to be the Director of the MBA program, and Shanta Hegde, Associate Dean for Graduate Programs, regarding whether students would receive academic credit for their work at the Innovation Accelerator for the summer semester. Plaintiff wanted students to be required to receive credit in the summer because there had been instances in the past when students who did not do work had caused "real team problems." He also believed that the Innovation Accelerator could not complete certain research without approval of UConn's Institutional Review Board, which required that students be enrolled for course credit.

In an email dated March 28, 2010, responding to a request by Hegde, plaintiff explained his understanding of the Institutional Review Board and two alternative ways to obtain its approval. After March 28, 2010, plaintiff learned that Nancy Wallach, Director of Research Compliance at UConn, had advised Hegde that summer projects conducted by students working as paid interns without receiving course credit did not need to be reviewed by the Institutional Review Board.

In April and May 2010, plaintiff engaged in discussions concerning a new

4

fellowship program that would replace the prior manner of compensating the students participating in the Innovation Accelerator.  Under the then-current compensation model, the undergraduate students received a combination of wages for hours worked plus course credit, while the graduate students received a graduate assistantship plus course credit.

On April 24, 2010, plaintiff sent an email to Hegde, inquiring about the logistics of the fellowship program, how the offer letters should be worded, and whether the university maintained insurance that would cover the students working on a fellowship in the event that they were injured traveling for a project.  As to the insurance issue, he wrote: "Right now students are covered by worker's compensation on a TA/GA special payroll or UG pay but I don't know if worker's compensation coverage would extend to a student being paid by scholarship."  Plaintiff copied his supervisor, Professor Dino, on this email.  Hegde responded that students would be paid by fellowship based on their registration in Accelerator Innovation courses, that the wording of the offer letter was being worked on, and that students would be covered under the "field trip policy."  He copied other administrators including Dean Earley.

Hegde later sent an email to other innovation accelerator directors requesting feedback on a "Discussion Draft" relevant to the new fellowship model.  In an email dated May 10, 2010 responding to the email from Hegde, plaintiff expressed his concern that undergraduates participating in the Innovation Accelerator would receive fellowships.  He noted that "[t]o date they are all on undergraduate payroll, under which they get worker's compensation coverage as their payroll is taxed at 0.99% for worker's compensation."  He also stated that the undergraduate students offered fellowships

should be informed of the amount of hours and the location of the work.  Plaintiff also expressed concern that the fellowship and field trip policies might raise a legal issue under labor laws that would expose the university to liability.

That day, Dean Earley sent an email to the entire group that addressed plaintiff's concern about labor laws.  He wrote:

> Luke (and others),
>
> Once all of the relevant parties meet we'll have a sense of what is the best way forward.  Please note for everyone that past practice doesn't limit us for the future practice and we need to think through what makes the most sense given our evolving program and curricula.
>
> I don't want to hear yet again about the labor law issue or the fellowship. We've consulted with the graduate college, AG's office, and registrar . . . . So please don't raise this issue again unless someone has new information.  I'm getting rather tired of roadblocks thrown up that have been addressed and I see it as counterproductive to what we are trying to achieve.

Dean Earley indicated further that he would be happy to address the issue in person with anyone who wanted to discuss it further. Plaintiff did not make arrangements to speak with Dean Earley about his concerns relevant to labor laws and the fellowship model.

In a later email dated May 25, 2010, to Director of Compliance Rachel Rubin, plaintiff indicated that he believed that Wallach's conclusion regarding the summer interns was based on faulty information.  In that email, he provided attachments consisting of prior emails that documented his communications concerning the Innovation Accelerator Discussion Draft and his discussions concerning the Institutional Review Board approval.  He explained to Rubin that the issues concerning the implications of the fellowship model would be discussed at a meeting on May 27, 2010.

He also indicated his concern that another business school center known as SCOPE had interviewed under-18-year old athletes participating in the Special Olympics without approval of the Institutional Review Board.

During his discussions with Rubin, plaintiff communicated his concern about Dean Earley's appointment of Earley's wife as Director of SCOPE, which plaintiff has stated presented a potential violation of state ethics rules due to nepotism.  Rubin later brought this issue up with Dean Earley.

According to his deposition testimony, in May and June 2010, Provost Peter Nicholls had discussions with Dean Earley relevant to implementing a search procedure to fill all director positions going forward.  On June 8, 2010, defendant Dean Earley sent an email to all School of Business faculty that requested nominations and invited applications for five administrative positions, including the Director of the Innovation Accelerator.

Plaintiff and other Business School faculty questioned whether the search process should include the Director of the Innovation Accelerator.  Dean Earley and Associate Dean Linda Klein raised the issue with Vice Provost Nancy Bull, who responded that the search was required for the Innovation Accelerator Director because plaintiff's term would end on August 22, 2010.

On June 21, 2010, Dean Earley sent an email to plaintiff that explained that the search was required for the Innovation Accelerator Director position. Vice Provost Bull, who was copied on the email, responded: "Chris–in essence this is all accurate ... The offer letter will be for one year with the opportunity to automatically renew for a second year based on performance and funding...."

That same day, Nancy Toomey, the Dean's assistant, informed plaintiff that he had been nominated and that the deadline for applying had been extended to the end of the day on June 25, 2010. She also advised plaintiff that he would need to send her his letter of interest and his curriculum vitae.

On June 22, 2010, plaintiff sent an email replying to the emails sent by Dean Earley and Vice Provost Bull regarding the search procedure for the director position. He wrote: "Now with all due respect, my situation appears to have gone from a planned meeting with the Provost's office (June 9 email), then a meeting with the Provost together with the Dean (June 10 email) – now to the Provost's office having a meeting with the Dean's office and presenting me with a dictate (June 21, 22 emails). I still expect to have the offered meeting before I made any decisions. But that is your call to make." Plaintiff did not attach his curriculum vitae to this email to Dean Earley or Vice Provost Bull.

On July 19, 2010, plaintiff, Dean Earley, Vice Provost Bull and others participated in a meeting to discuss the future of the Innovation Accelerator and the requirement that plaintiff apply for the director position. As of that date, plaintiff had not provided an application for the Innovation Accelerator Director, and Dean Earley had not yet appointed anyone for the position. At that meeting, plaintiff conveyed that he was opposed to a redesign of the MBA and disapproved of plans for the Innovation Accelerator.

Subsequent to the July 19 meeting, Dean Earley made the decision not to appoint plaintiff to a new term as the Director of the Innovation Accelerator. In a letter dated July 28, 2010, Dean Earley informed plaintiff of the decision not to appoint him as

8

Director.  Plaintiff received the letter on July 30, 2010.  He retained a position as Assistant Professor in Residence until August 22, 2011 when his term expired.[4]

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).  If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Anderson, 477 U.S. at 249.

A.     First Amendment Retaliation

Plaintiff asserts that defendants retaliated against him by not reappointing him as Director of the Innovation Accelerator or Associate Professor in Residence for exercise

---

[4] In May 2011, plaintiff was notified that he would not be appointed to this position after expiration of his term.

9

of his First Amendment rights in violation of 42 U.S.C. § 1983 and Connecticut General Statutes § 31-51q.  In his brief, plaintiff argues that his non-reappointment was the result of retaliation due to his complaints about unethical activity, namely the nepotism represented by Dean Earley's appointment of his wife to be the Executive Director of the SCOPE program. Defendants maintain that plaintiff cannot establish that his allegedly protected speech is entitled to First Amendment protection.

Plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) defendants took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.  Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).  If a plaintiff establishes this *prima facie* case of retaliation, the burden then shifts to the defendant to "show that it would have taken the same adverse action in the absence of the protected speech." Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011). Plaintiff then has the burden to demonstrate by the preponderance evidence that the legitimate reason offered by the defendant was a pretext for the alleged retaliation. Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004)).

    1.    Prima Facie Case

To receive First Amendment protection, an employee must speak "as a citizen on a matter of public concern."  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).   Thus, the Court must consider two separate inquiries: (1) whether the subject of the speech at issue constitutes a matter of public concern; and (2) whether the employee spoke as a "citizen" rather than as an employee.  Ricciuti v. Gyzenis, 832 F. Supp. 2d 147, 154 (D. Conn. 2011).  Defendants characterize plaintiff's speech as an internal employee

complaint concerning internal structure and governance of the university.

        a.    Public Concern

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane v. Franks, 134 S.Ct. 2369, 2380 (2014). Whether an employee's speech addresses a matter of public concern is a question of law, Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999), and should be determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). Speech does not touch upon a matter of public concern if it seeks to redress personal grievances rather than "broader public purposes." Lewis, 165 F.3d at 163. A personal grievance is not transformed into a matter of public concern by invoking an interest in the way that public institutions are run. Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008). Although a factor, the speaker's motive is "not dispositive when the a court considers whether the speech at issue addresses a matter of public concern." Sousa v. Roque, 578 F.3d 164, 173 (2d Cir. 2009).

    Defendants maintain that "it is clearly not beyond all debate that plaintiff's utterances were a matter of public concern." Plaintiff argues that his speech concerning Dean Earley's nepotism as a potential ethics violation was relevant to matters of public concern including possible corruption within the state university system and misuse of public funds. It is well established that corruption in a public program and misuse of government funds are matters of significant public concern.

Lane, 134 S.Ct. at 2380.  Here, defendants have not substantiated their assertion that plaintiff expressed his concern about Dean Earley's nepotism to further a personal grievance regarding his reappointment. The Court is mindful that the inferences of fact should be construed most favorably to plaintiff.  Because nepotism, cronyism and non-merit based appointments in government service may constitute subjects of public interest, Hagan v. City of New York, 39 F. Supp. 3d 481, 507 (S.D.N.Y. 2014), the Court finds that plaintiff's speech concerning Dean Earley's nepotism as a potential ethics violation constitutes a matter of public concern.

        b.        Citizen or Public Employee

The Court must next consider whether plaintiff spoke as a citizen or a public employee. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti. 547 U.S. at 421.  Speech made as an employee must have been "in furtherance of one of" the employee's "core duties."  Weintraub v. Bd. of Educ., 593 F.3d 196, 203 (2d Cir. 2010). Thus, it follows that speech concerning information related to or learned through public employment may still be protected if it was not expressed as part of the employee's ordinary duties.  Lane, 134 S.Ct. at 2378. "[W]hen a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." Matthews v. City of New York, 779 F.3d 167, 174 (2d Cir. 2015).  Whether a

government employee's duties do or do not have a civilian analogue is a question of law.  Jackler v. Byrne, 658 F.3d 225, 238 (2d Cir. 2011).  "Examples of speech with a civilian analogue include a letter to the local newspaper and complaints to elected officials or independent state agencies."  Micillo v. New York City Dept. of Educ., 2015 WL 427392, *6 (S.D.N.Y. 2015).

There is no bright line rule to determine whether an employee is speaking pursuant to his or her official duties; courts must examine the nature of the job responsibilities, the nature of the speech, and the relationship between the two.  Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012).

Plaintiff voiced his nepotism concerns to Director of Compliance Rubin. Defendants have not demonstrated that plaintiff's communication with Rubin fell within plaintiff's ordinary job responsibilities nor that plaintiff's speech lacks a civilian analogue.  Plaintiff maintains that the Office of Audit, Compliance and Ethics ("OACE") represents a civilian analogue because it is a channel available to the non-employees for reporting ethical violations. Construing the allegations most favorably to plaintiff, the Court finds that plaintiff spoke about the potential ethical violation represented by Dean Earley's alleged nepotism as a citizen rather than a public employee.

    c. Balancing of the Interests

The Court must next consider the balancing test articulated in Pickering v. Bd. of Educ., 391 U.S. 563 (1968). "When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences."  Garcetti, 547 U.S. at 423.  "Government employers, like private employers, need a significant degree of

13

control over their employees' words and actions in order that employees not contravene governmental policies or impair the proper performance of governmental functions." Jackler, 658 F.3d at 234.

Pursuant to the Pickering balancing test, a defendant employer may take adverse action against a public employee for speech on matters of public concern if the government had "an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." Lane, 134 S.Ct. at 2380. "[D]efendants bear the burden of demonstrating that the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." Smith v. County of Suffolk, 776 F.3d 114, 119 (2d Cir. 2015). Government employers have legitimate interests in effective fulfillment of their responsibilities to the public. Connick, 461 U.S. at 150. "Defendants need not present evidence that such harm or disruption––which may include having the judgment and professionalism of the agency brought into serious disrepute–has in fact occurred, but only that it made a reasonable determination that the employer's speech creates the potential for such harms." Smith, 776 F.3d at 119.

A stronger showing of government interest may be necessary where an employee's speech involves substantial matters of public concern. Lane, 134 S. Ct. at 2381. The government interest "may be particularly weighty if the employee in question holds an executive or policymaking position." Faghri v. Univ. of Connecticut, 621 F.3d 92, 98 (2d Cir. 2001) (repeated and public opposition to university administration policies entitled university to demote plaintiff to remove him from management team).

Speech of a high-level supervisor with confidential, policymaking or advisory capacity will be more disruptive to the operation of the workplace than that of a low level employee.  McEvoy v. Spencer, 124 F.3d 92, 102 (2d Cir. 1997).  The Second Circuit has held that a public institution "is entitled, for the sake of implementation of its policies, to have in management positions, especially high-ranking executive positions, persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them." Faghri, 621 F.3d at 97.

The weighing of the competing interests is a question of law for the Court to decide.  Lewis, 165 F.3d at 164.  However, disputed factual issues may preclude the Court from determining on summary judgment whether a defendant's interests outweigh that of the plaintiff.  Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 558 (2d Cir. 2001).

It is disputed whether Dean Earley knew about plaintiff's speech concerning nepotism.  Thus, the Court assumes for purposes of this ruling that Dean Earley knew of plaintiff's communication about nepotism.  The Court finds that the value of plaintiff's communication is limited because one instance of potential nepotism, although a matter of public concern, affects a discrete number of individuals and only a small portion of the public fisc.  At the same time, due to plaintiff's high-level position, plaintiff's criticism of Dean Earley and his appointments had the potential to undermine his authority as a dean and his capacity to continue to set policies for the Business School.  The potential for disruption was particularly acute due to the efforts to redesign the learning accelerator programs, and Dean Earley noted that plaintiff's concerns about labor laws and fellowships appeared to be "counterproductive."  Balancing the potential for

disruption to the morale of the faculty and the ability of the Dean to satisfy his role as Dean against the limited value of the plaintiff's speech, the Court finds that defendants had a legitimate justification not to renew plaintiff's contract. Accordingly, summary judgment will be granted on this basis for the defendants.

    2.    <u>Qualified Immunity</u>

Alternatively, the Court finds that defendant Earley is entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). Consequently, a defendant is entitled to qualified immunity if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established constitutional right." <u>Hartline v. Gallo</u>, 546 F.3d 95, 102 (2d Cir. 2008).

"A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what [he or she] is doing violates that right." <u>Connell v. Signoracci</u>, 153 F.3d 74, 80 (2d Cir. 1998). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." <u>Moore v. Vega</u>, 371 F.3d 110, 114 (2d Cir. 2004). The Court need not rely on a "case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).

The defense of qualified immunity is an affirmative defense and a defendant must prove that it would be clear to a reasonable public official that his or her conduct was objectively reasonable. See Lore v. City of Syracuse, 670 F.3d 127, 149 (2d Cir. 2012) (noting that qualified immunity is an affirmative defense for which defendants have the burden of proof).  With respect to summary judgment, a court should find qualified immunity only where an official has met his or her burden demonstrating that no rational jury could conclude that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.  Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012).

At the time relevant to this action in 2010 and 2011, it was not clearly established that the First Amendment required a public employer to retain an adversary or critic in a sensitive, confidential or policy role.  Kaluczky v. City of White Plains, 57 F.3d 202, 210 (2d Cir. 1995) ("Neither the Constitution nor the Pickering balancing test requires a public employer to entrust an adversary or critic with a sensitive, confidential or policy role.").  As Second Circuit concluded in its 2010 decision in Faghri, a university is entitled, for the sake of implementing its policies, to appoint persons who will support its policies. 621 F.3d at 98.

Here, plaintiff's complaint about Dean Earley's alleged improper conduct spurred an investigation, potentially undermining the Dean's authority on making appointment decisions.  Thus, this Court finds that the Dean Earley was justified in considering plaintiff's speech as unprotected; he is entitled to qualified immunity based on his decision with regard to appointment of the Innovation Accelerator program.  Summary judgment will be granted in defendant Earley's favor on this basis.

3. Supplemental Jurisdiction

The Court will decline to exercise supplemental jurisdiction over the remaining state law claims, which will be dismissed without prejudice. See Donniger v. Niehoff, 642 F.3d 334, 357 (2d Cir. 2011). With Trusz v. UBS Realty, 319 Conn. 175 (2015), the Connecticut Supreme Court clarified that the governing standard applicable to retaliation claims pursuant to Connecticut General Statutes § 31-51q differs from federal First Amendment analysis. Thus, it is appropriate that the state court should interpret this recent ruling on state statutory law.

## CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment is GRANTED on the claim of First Amendment retaliation by Dean Earley. The Court declines supplemental jurisdiction over the state law claims pursuant to the Connecticut General Statutes § 31-51q and § 31-51m and the tort claim of intentional interference with advantageous business relationship, which are hereby remanded to state court.[5]

The clerk is instructed to close this case.

/s/Warren W. Eginton
Warren W. Eginton
Senior U.S. District Judge

Dated at Bridgeport, Connecticut this _21st___ day of January 2016.

---

[5] This case was removed from state court on the basis of federal question jurisdiction.