**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

**LUKE WEINSTEIN,**  3:11cv1906 (WWE)
    Plaintiff,

v.

**P. CHRISTOPHER EARLEY,**
    Defendants.

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this action, plaintiff Luke Weinstein, a former University of Connecticut ("UConn") professor and Director of the Innovation Accelerator ("IA") at UConn School of Business, alleged that defendant Dean P. Christopher Earley is liable for violation of his First Amendment right to free speech in violation of 42 U.S.C. § 1983.[1]

In a ruling filed August 28, 2015, this Court granted summary judgment on plaintiff's claims of First Amendment retaliation based on his speech relevant to workers' compensation coverage for students, payment for students, and Institutional Review Board approval. In his opposition brief, plaintiff argued that he had been retaliated against based on his speech concerning Dean Earley's nepotism. Specifically, plaintiff maintained that he was not reappointed him as Director of the IA or Associate Professor in Residence due to his complaints about Dean Earley's appointment of his wife as the Executive Director of the SCOPE, another program within the School of Business.

---

[1] The Court's ruling dated January 26, 2016 declined to exercise supplemental jurisdiction over plaintiff's state law claims against UConn and Dean Earley.

The Court ruled that it would consider the merits of plaintiff's claim and afforded defendant the opportunity to file a supplemental motion for summary judgment.

In a ruling dated January 26, 2016, the Court granted summary judgment on plaintiff's claims of retaliation based on his complaints of nepotism. The Court held that plaintiff's complaint was of public concern but that that defendant had a legitimate justification not to renew plaintiff's contract upon consideration of the potential for disruption to the morale of the faculty and the ability of the Dean to satisfy his role balanced against the limited value of the plaintiff's speech.

The Court held, in the alternative, that Dean Earley was entitled to the shield of qualified immunity. On appeal to the Second Circuit, plaintiff argued that the district court had erred by improperly deciding disputed issues of fact in applying the Pickering interest balancing framework and in awarding Earley qualified immunity. Weinstein v. Univ. of Conn., 676 Fed. Appx. 42, 43 (2d Cir. Jan. 20, 2017). The Second Circuit held:

> We need not decide these challenges because—even assuming that (1) Earley was aware of Weinstein's nepotism comments, (2) the Pickering balance as to those comments favored Weinstein, and (3) Earley was not entitled to qualified immunity—no reasonable jury could conclude from the record presented that, but for Weinstein's comments, he would have been reappointed as Director of the IA program. See Hartman v. Moore, 547 U.S. 250, 260, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) (holding that if "retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind") (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287, 97 S.Ct. 568)); see Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 877 (2d Cir. 1988). To the contrary, a reasonable jury could only conclude that Weinstein would not have been reappointed even absent the nepotism complaint. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287, 97 S.Ct. 568; accord Smith v. County of Suffolk, 776 F.3d at 119.

Id. The Second Circuit elaborated that the Weinstein "repeatedly questioned proposed changes" to the IA program; that Earley asked Weinstein to stop because Weinstein's actions were "counterproductive" to the program goals; that Weinstein persisted in raising program concerns with various University personnel before he made comments regarding Earley's nepotism; that prior to expiration of his 2009–10 annual term as Director, Weinstein expressed to Earley and other officials his concerns about changes to the program and expressed reservations about being "captain" of a ship that was "going to sink;" and that Earley "consistently conditioned reappointment on Weinstein's sincere acceptance of changes to the IA program." id. at 44-45. The Second Circuit explained:

> Weinstein does not contest the district court's ruling that his speech regarding the IA program was not protected by the First Amendment. Thus, we easily conclude that the record evidence convincingly demonstrates a determinative link between this "nonprotected" speech and the challenged adverse action that would compel a jury to make a preponderance finding that Weinstein would not have been reappointed Director even without his nepotism complaint.

id. at 44. The Second Circuit remanded to the district consideration of plaintiff's retaliation claim based on the failure to be reappointed as an Assistant Professor in May 2011. The Second Circuit noted that Weinstein had "identified as protected speech not only his nepotism comments, but also the September 2010 grievance that he filed after the adverse Director decision but before the adverse Assistant Professor decision," and that "the district court did not expressly address this retaliation claim in its January 21, 2016 decision." id. at 45.

Defendant Earley has submitted a motion for summary judgment on the claims

based upon plaintiff's failure to be renewed as an Assistant Professor due to his May 2010 and September 2010 communications.

## BACKGROUND

The parties have submitted statements of fact with supporting exhibits attached. The statements of fact, exhibits and pleadings reveal the following factual background. The Court incorporates herein the background from its prior rulings and includes additional material relevant to the grievance procedure and the non-renewal of plaintiff's Assistant Professor position.

Plaintiff was employed at UConn from January 2007 until August 22, 2011. Until August 22, 2010, he was employed as the Director of the IA, an experiential learning center, and as an Assistant Professor in Residence in the Management Department of the School of Business Management. From August 23, 2010, through August 22, 2011, plaintiff was employed solely as an Assistant Professor in Residence.

The appointment letter for the 2010-2011 position of Assistant Professor in Residence provided: "This position does not lead to permanent academic tenure but it may be renewed annually depending upon performance, funding and relevance to the academic mission."

On May 25, 2010, to Director of Compliance Rachel Rubin, plaintiff voiced his concerns regarding Institutional Review Board Approvals for summer interns working on certain IA projects and the insurance/worker's compensation implication of a new fellowship model. During his discussions with Rubin, plaintiff communicated his concern about Dean Earley's appointment of Earley's wife as Director of SCOPE, which

plaintiff has stated presented a potential violation of state ethics rules due to nepotism.

According to his deposition testimony, Provost Peter Nicholls had discussions with Dean Earley relevant to implementing a search procedure to fill all director positions going forward in May and June 2010.

On June 8, 2010, defendant Dean Earley sent an email to all School of Business faculty that requested nominations and invited applications for five administrative positions, including the Director of the IA.

That same day, plaintiff signed the 2010-11 appointment letter for the Assistant Professor in Residence.

On June 22, 2010, plaintiff sent an email replying to the emails sent by Dean Earley and Vice Provost Nancy Bull regarding the search procedure for the director position.   He wrote: "Now with all due respect, my situation appears to have gone from a planned meeting with the Provost's office (June 9 email), then a meeting with the Provost together with the Dean (June 10 email) – now to the Provost's office having a meeting with the Dean's office and presenting me with a dictate (June 21, 22 emails).   I still expect to have the offered meeting before I made any decisions.   But that is your call to make."   Without attaching his curriculum vitae, plaintiff concluded this email with: "I have signed an in-residence contract to teach in the department of management for the 2010-2011 year.   I would love to find a way to continue as Director of IA."

On July 19, 2010, plaintiff, Dean Earley, Vice Provost Bull and others participated in a meeting to discuss the future of the IA and the requirement that plaintiff apply for the director position.   At that meeting, Dean Earley indicated that it was important for

5

plaintiff to be supportive of the redesigned MBA program if he were to become Director. Relevant to submission of an application, Dean Earley stated: "The issue is whether or not you want to continue. Now one of the things that's a bit – complicates this even further is you were nominated and contacted about sending in materials for this position. You chose not to. And that's problematic from our process perspective because now if we appoint you to this position, well we've done so without having followed the same procedure we used for all of the other directors of the positions." Plaintiff later stated that if he was hired, he'd have concerns about being captain of a model that would sink and that he was not comfortable with changes that were being made to the program.

Subsequent to the July 19 meeting, Dean Earley made the decision not to appoint plaintiff to a new term as the Director of the IA. In a letter dated July 28, 2010, Dean Earley informed plaintiff of the decision not to appoint him as Director. Plaintiff received the letter on July 30, 2010.

Plaintiff retained his position as Assistant Professor in Residence from August 23, 2010, until August 22, 2011, when his term expired. Plaintiff had been tentatively scheduled to teach three courses in fall 2011. In his deposition, Dean Earley stated that he believed these courses were electives rather required courses.

In May 2011, plaintiff learned that he would not be renewed to the position of Assistant Professor in Residence. In his deposition, Dean Earley explained that plaintiff's 2010/2011 position had been possible because Provost's office had given a special dispensation to use UConn's General Funds when the School of Business did not have funding for the position. He represented that the Provost's Office had not

6

provided for similar funding toward plaintiff's Assistant Professor in Residence contract for 2011 through 2012.

He elaborated that due to a university-wide hiring freeze,[2] the Provost had directed that hiring would only be permitted for positions associated with critical need or safety issues; if a position were vacated due to a retirement or an individual voluntarily leaving, the line money for that position would automatically revert to UConn. According to his deposition testimony, if an individual were appointed as an Assistant Professor in Residence, it would not be appropriate to use funds from the Connecticut Center for Entrepreneurship and Innovation ("CCEI"); CCEI funds were required to be used to a position attached to the mission of the CCEI.

In his deposition, Provost Peter Nicholls represented that after the legislature funded a project such as CCEI, it would "keep tabs on it" and then "it sort of melds into the block grant and becomes just like any other money." He stated " "it's not as if we keep CCEI money in a sort of separate pot and say, Luke can only be paid from there or not. We could have increased the funding to CCEI, we could have decreased the funding to CCEI." In his deposition, Dean Earley had also agreed that the Provost could approve CCEI funds to be used for a position not attached to the CCEI.

Grievance Procedure

On September 10, 2010, the American Association of University Professors ("AAUP") filed a grievance on plaintiff's behalf pursuant to the collective bargaining

---

[2] Plaintiff does not appear to dispute that the hiring freeze was instituted.

agreement. It stated:

> Prof. Weinstein has several issues under consideration, but one is that he has had a title change that is not in the list of titles that AAUP has in the AAUP collective bargaining agreement. "In residence teaching faculty" is not a position recognized at UConn. Assistant Professor in Residence is a legitimate title.
>
> Professor Weinstein also believes that he was lured to the University and away from an offer at another university that held the prospect of a tenure track position, as this UConn position was offered with the prospect of continuance subject to continued state funding and satisfactory performance. He has witnesses to the offer circumstances and the change in the position is a material change in the agreement on which he agreed to accept the position. No assertion has been made that his performance is unsatisfactory and the funding continues.

According to the Step One grievance hearing notes of Linda Klein, Associate Dean and Professor of Finance, plaintiff asserted that that he was not renewed as the Director due to his whistleblowing activity.

The Step One grievance was denied based on findings that the appointment decision had been made in accordance with the relevant procedures and that it was motivated by concerns unrelated to any alleged whistleblowing.

In an email dated January 19, 2011, AAUP Executive Director Ed Marth sought further review with a Step Two grievance on plaintiff's behalf. He wrote:

> Professor Weinstein believes that he was improperly forced out of a position by virtue of making him apply for a position he was hired into following a valid search; that said action violated the whistleblower statute (which requires that where there is a collective bargaining relationship that the matter be pursued in that venue); that the action was retaliatory and arbitrary.

At the Step Two hearing held by Vice Provost Bull, plaintiff had the opportunity to speak and to provide Bull with copies of emails relevant to his whistleblowing claims.

The Step two Grievance Response dated August 11, 2011, issued from Vice

Provost Bull considered "two related grievances filed by" Weinstein. The Response explained:

> The first grievance concerns the process that was used in considering whether to reappoint Dr. Weinstein to an administrative assignment as Director of the Innovation Accelerator. The second concerns the decision not to renew Dr. Weinstein's appointment as an Assistant Professor In-Residence….The first grievance was heard and denied by the Dean's Office (Dean P. Christopher Earley and Associate Dean Linda Klein) of the School of Business. The second grievance was filed directly with the Provost at Step 2 of the grievance process.

The Response found that the filing of the Step Two grievance was untimely and denied both grievances. It also stated that the grievance concerning the Director of the IA appointment should be denied for the reasons articulated in the Step One denial.

Relevant to the Assistant Professor in Residence position, the Response stated:

> I have been advised by the School of Business that the courses Professor Weinstein was assigned to teach in 2010-2011 were all electives rather than required ones. Moreover, four of five departments within the School have lost faculty. Given that only a few positions have been allocated to address the School's hiring needs, it has elected to allocate those positions to critical needs such as finance and accounting. Management courses are not in as high demand as other disciplines so the School is refilling Management courses positions in a very limited way. For this reason, the School is simply reducing electives in the area and adding staffing to key areas of emphasis. It is clear that legitimate, non-retaliatory reasons exist for the non-renewal of Dr. Weinstein.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp.,

664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

    A.    <u>First Amendment Retaliation</u>

The Court must consider whether defendant Earley retaliated against plaintiff for exercise of his freedom of speech rights by not reappointing him to the Associate Professor in Residence. Plaintiff argues that his non-reappointment was the result of retaliation due to his complaints about unethical activity, namely the nepotism represented by Dean Earley's appointment of his wife to be the Executive Director of the SCOPE program, and his grievance filed after the adverse Director decision but before the adverse Assistant Professor decision.

Plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) defendants took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech. Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011). If plaintiff

establishes a prima facie case, defendant may escape liability if it can demonstrate that (1) it would have taken the same adverse action in the absence of the protected speech, or (2) show that plaintiff's speech was likely to disrupt defendant's activities, and that the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." Zehner v. Jordan-Elbridge Bd. of Educ., 666 Fed. Appx. 29, 31 (2d Cir. 2016).

    1.    Prima Facie Case

To receive First Amendment protection, an employee must speak "as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). Thus, the Court must consider two separate inquiries: (1) whether the subject of the speech at issue constitutes a matter of public concern; and (2) whether the employee spoke as a "citizen" rather than as an employee. Ricciuti v. Gyzenis, 832 F. Supp. 2d 147, 154 (D. Conn. 2011).

        a.    Public Concern

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Lane v. Franks, 134 S.Ct. 2369, 2380 (2014). Whether an employee's speech addresses a matter of public concern is a question of law, Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999), and should be determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "The forum in which a petition is lodged will be

11

relevant to the determination of whether the petition relates to a matter of public concern." Borough of Buryea, Pa v. Guarnieri, 131 S.Ct. 2488, 2501 (2011) (noting that employee petitions filed through internal grievance procedures will "in many cases…not seek to communicate to the public or to advance a political or social point of view beyond the employment context.").

Speech does not touch upon a matter of public concern if it seeks to redress personal grievances rather than "broader public purposes." Lewis, 165 F.3d at 163. A personal grievance is not transformed into a matter of public concern by invoking an interest in the way that public institutions are run. Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008). However, employee grievances concerning employment conditions can be a matter of public concern where the litigation serves "as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." Borough of Duryea, Pa, 131 S.Ct. at 2500. Although a factor, the speaker's motive is "not dispositive" when the court considers whether the speech touches upon a matter of public concern. Sousa v. Roque, 578 F.3d 164, 173 (2d Cir. 2009).

Based upon its prior decision dated January 20, 2016, the Court has already held that plaintiff's May 2010 complaint to Rubin about nepotism constitutes a matter of public concern. Nepotism, cronyism and non-merit based appointments in government service may constitute subjects of public interest. Hagan v. City of New York, 39 F. Supp. 3d 481, 507 (S.D.N.Y. 2014). Thus, the Court will consider whether plaintiff's grievance filed on September 10, 2010, prior to his non-renewal as Assistant Professor

constitutes a matter of public concern.

On its face, the initial grievance, filed September 10, 2010, addresses issues relevant to plaintiff's position and his treatment within the UConn School of Business that fail to touch upon a public concern. Plaintiff's grievance later encompassed plaintiff's concern that he had been retaliated against based upon his complaints of unethical nepotism, which could potentially touch upon a matter of public concern. However, in the context of plaintiff's labor grievance, plaintiff's referenced concern about nepotism was made in furtherance of his personal interest about his treatment and failure to be reappointed. The record contains no indication that plaintiff's grievance about retaliation for whistleblowing constitutes a communication of useful information to the public. The Court finds as a matter of law that plaintiff's grievance sought to redress personal grievances rather than advance a broader public purpose.

          b.      Citizen or Public Employee

Further, even assuming plaintiff's grievance did touch upon a matter of public concern, the Court finds plaintiff's grievance that he suffered retaliation due to his whistleblowing represents speech made as a public employee.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. Speech made as an employee must have been "in furtherance of one of" the employee's "core duties." Weintraub v. Bd. of Educ., 593 F.3d 196, 203 (2d Cir. 2010). Thus, it follows that speech concerning information related

to or learned through public employment may still be protected if it was not expressed as part of the employee's ordinary duties. Lane, 134 S.Ct. at 2378. "[W]hen a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." Matthews v. City of New York, 779 F.3d 167, 174 (2d Cir. 2015). Whether a government employee's duties do or do not have a civilian analogue is a question of law. Jackler v. Byrne, 658 F.3d 225, 238 (2d Cir. 2011). "Examples of speech with a civilian analogue include a letter to the local newspaper and complaints to elected officials or independent state agencies." Micillo v. New York City Dept. of Educ., 2015 WL 427392, at *6 (S.D.N.Y. 2015).

There is no bright line rule to determine whether an employee is speaking pursuant to his or her official duties; courts must examine the nature of the job responsibilities, the nature of the speech, and the relationship between the two. Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012). Contextual considerations may include whether the complaint was conveyed to the public. Jeune v. Crew, 2017 WL 4357382, at *8 (Sept. 29, 2017). Even if speech is not "required by, or included in, the employee's job description, or in response to a request by the employer," it may constitute employee speech if it represents part of the employee's concerns about proper execution of the employee's duties. Weintraub, 593 F.3d at 203

Here, plaintiff's complaint to Rubin about Dean Earley's nepotism, a potential

ethics violation, was made during a discussion about his general concern about the internal management of the Business School, particularly changes to the IA; and his grievance about retaliation for whistleblowing related to his personal concern about the reappointment procedure. Unlike plaintiff's complaint to Rubin through the Office of Audit, Compliance and Ethics ("OACE"), which is a potential channel available to the non-employees for reporting ethical violations, the collective bargaining agreement grievance procedure is available only to employees and lacks a citizen analogue. See Weintraub, 593 F.3d at 204. Accordingly, the Court finds that plaintiff's communication in his September 2010 grievance represents unprotected employee speech.

        c.        Balancing of the Interests

For purposes of this ruling, the Court will also assume that plaintiff's communication in his September 2010 grievance constitutes speech made as a citizen on a matter of public concern. Accordingly, the Court will consider the balancing test articulated in Pickering v. Bd. of Educ., 391 U.S. 563 (1968) relevant to plaintiff's May 2010 nepotism complaint and his September 2010 grievance.

"When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." Garcetti, 547 U.S. at 423. "Government employers, like private employers, need a significant degree of control over their employees' words and actions in order that employees not contravene governmental policies or impair the proper performance of governmental functions." Jackler, 658 F.3d at 234.

Pursuant to the Pickering balancing test, a defendant employer may take adverse action against a public employee for speech on matters of public concern if the government had "an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." Lane, 134 S.Ct. at 2380. "[D]efendants bear the burden of demonstrating that the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." Smith v. County of Suffolk, 776 F.3d 114, 119 (2d Cir. 2015). Government employers have legitimate interests in effective fulfillment of their responsibilities to the public. Connick, 461 U.S. at 150. "Defendants need not present evidence that such harm or disruption—which may include having the judgment and professionalism of the agency brought into serious disrepute–has in fact occurred, but only that it made a reasonable determination that the employer's speech creates the potential for such harms." Smith, 776 F.3d at 119.

A stronger showing of government interest may be necessary where an employee's speech involves substantial matters of public concern. Lane, 134 S.Ct. at 2381. The government interest "may be particularly weighty if the employee in question holds an executive or policymaking position." Faghri v. Univ. of Conn., 621 F.3d 92, 98 (2d Cir. 2001) (repeated and public opposition to university administration policies entitled university to demote plaintiff to remove him from management team). Speech of a high-level supervisor with confidential, policymaking or advisory capacity

16

will be more disruptive to the operation of the workplace than that of a low level employee.  McEvoy v. Spencer, 124 F.3d 92, 102 (2d Cir. 1997).   The Second Circuit has held that a public institution "is entitled, for the sake of implementation of its policies, to have in management positions, especially high-ranking executive positions, persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them."  Faghri, 621 F.3d at 97.

The weighing of the competing interests is a question of law for the Court to decide.  Lewis, 165 F.3d at 164.   However, disputed factual issues may preclude the Court from determining on summary judgment whether a defendant's interests outweigh that of the plaintiff.  Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 558 (2d Cir. 2001).

Thus, the Court assumes for purposes of this ruling that Dean Earley knew of plaintiff's communication about nepotism.   Consistent with its January 2016 ruling, the Court finds that plaintiff's communications about Dean Earley's nepotism expressed in his May 2010 complaint and his September 2010 grievance have limited value.   One instance of potential nepotism affects a discrete number of individuals and only a small portion of the public fisc.   Plaintiff's criticism of Dean Earley's decisions relative to business school programs and appointments had the potential to undermine the Dean's authority in his capacity as the Dean of the Business School.   Balancing the potential for disruption to the morale of the faculty and the ability of the Dean to satisfy his role as Dean against the limited value of the plaintiff's speech, the Court finds that defendants had a legitimate justification not to renew plaintiff's contract.   Accordingly, summary

judgment will be granted on this basis for the defendant Earley.

        d.        <u>Mount Healthy Defense</u>

Consonant with the Second Circuit's ruling relevant to the Director of the IA adverse decision, the Court finds that defendant has satisfied the defense that the same adverse employment action would have occurred even in the absence of the protected conduct. <u>Weinstein</u>, 676 Fed. Appx. at 43. Even if plaintiff can establish that his communication constitutes protected speech and that the <u>Pickering</u> balance favors his communication, the Court finds that a reasonable jury would still conclude, even absent his May 2010 and his September 2010 communications, that plaintiff's position as Assistant Professor would not have been renewed due to plaintiff's failure to support Dean Earley's direction for the Business School and the financial constraints of the hiring freeze. Accordingly, summary judgment will be granted in defendant's favor.

## CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment is GRANTED. The clerk is instructed to close this case.

                                    <u>/s/Warren W. Eginton</u>
                                      Warren W. Eginton
                                      Senior U.S. District Judge

Dated at Bridgeport, Connecticut this __1st__ day of November 2017.